ALLSTATE INSURANCE COMPANY, Plaintiff,

v.

ADMINISTRATIA ASIGURARILOR DE STAT; Asigurarea Romaneasca S.A.; Astra S.A.; Carom S.A.; Reaseguradora Albatros; Allami Biztosito Banco De Seguros Del Estado; Caisse Nationale De Reassurance; Ceska Statni Pojistovna; Eastern Marine & Fire Insurance Co., Ltd.; Instituto Nacional De Reaseguros; Kuwait Insurance Co., S.A.K.; Compania Mercantil De Mundial De Panama, S.A.; Pan Korea Insurance Co.; Philippine Reinsurance Corp.; Pozavarovalna Skupnost Sava; Societe D'Assurance Sy-

rienne S.A.; P.T. Reasuransi Umum Indonesia; Universal Guarantee Insurance Co. of Auckland; Halvanon Insurance Co., Ltd.; Korean Reinsurance Corp.; Milli Reassurans, T.A.S.; Milli Reassurans, R.C.D.; Societe Centrale De Reassurance; Seguros La Territorial, S.A.; Caja Nacional De Ahorro Y Seguro; International Fire & Marine Insurance Co., Ltd.; Grupo Universal De Reaseguros P.T. Asuransi Antar Malayan Bali; Eastern General Reinsurance Corp.; P.T. Asuransi Kredit Indonesia; Aseguradora Mundial, S.A.; Seguros Progreso, S.A.; Mutuelle Centrale Marocaine D'Assurance; Groupe Kleber, Defendants.

No. 86 Civil 2365 (DNE).

United States District Court, S.D. New York.

April 28, 1997.

See also 875 F.Supp. 1022; 948 F.Supp. 285.

Saiber Schlesinger Satz & Goldstein, Newark, NJ (David J. D'Aloia, of counsel), for plaintiff Allstate Insurance Company.

Law Offices of George W. Wright, Bronx, NY, for defendant Administratia Asigurarilor de Stat.

### OPINION & ORDER

EDELSTEIN, District Judge:

Presently before this Court is a cross-motion for summary judgment which defendant Administratia Asigurarilor De Stat ("defendant" or "ADAS") brought as part of a series of motions decided by this Court in *Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 875 F.Supp. 1022 (S.D.N.Y.1995) (the "1995 Opinion"). The 1995 Opinion, however, did not explicitly adjudicate ADAS's cross-motion for summary judgment, a fact which was brought to this Court's attention only recently. To rectify this situation, this Court presently will consider ADAS's cross-motion. For the following reasons, ADAS's cross-motion is denied.

### BACKGROUND

The instant case arises out of a complex series of international insurance, reinsurance, and retrocession transactions. The details of these transactions are set forth in two previous decisions of this Court, *see id.* at 1023–

25; *Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 948 F.Supp. 285, 289–92 (S.D.N.Y.1996), and a familiarity therewith is assumed. Accordingly, only those facts necessary to resolving the instant motion will be discussed.

ADAS was an insurance company organized in 1952 under the laws of the former Socialist Republic of Romania ("SRR"). (ADAS's Memorandum of Law in Support of Cross–Motion to Dismiss Complaint and in Opposition to Plaintiff's Motion to Amend Complaint and Compel Pre–Answer Security, *Allstate Ins. Co. v. Administratia Asiqurarilor de Stat,* 86 Civ. 2365 ("ADAS Memo") at 1 (Mar. 29, 1993).) Until its dissolution in 1990, ADAS, was "100% owned by the SRR." *Id.* In 1975, ADAS executed in Bucharest, Romania a retrocession agreement (the "Retrocession Agreement") by which the POSA Group, acting on behalf of Seguros La Republica ("SLR"), Allstate's reinsurer, "ceded to ADAS certain shares of reinsurance which are the subject of Allstate's claim against ADAS in this action." *Id.* at 2.

ADAS maintains that, "[a]fter discovering fraudulent conduct by [the] POSA [Group] and certain of its affiliates ... ADAS commenced an action in 1981 in the Bucharest Court of District No. 3 for rescission of the Retrocession Agreement and other agency and reinsurance contracts to which ADAS was a party." *Id.* ADAS contends that "[t]he Bucharest Court subsequently rendered Civil Judgment No. 2459 ... on January 24, 1983 rescinding and declaring void *ab initio* the Retrocession Agreement and the other agency and reinsurance agreements among ADAS, the POSA entities, and [SLR]" (the "Bucharest Judgment"). *Id.* at 2–3; *see also* (Notice of Cross–Motion to Dismiss the Complaint, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 ("Notice of Cross–Motion") at Exh. C (Mar. 29, 1993).)

ADAS further asserts that "[a]s a consequence of the revolutions in 1989 in Eastern Europe and, particularly, in Romania, the SRR was abolished and a new political regime oriented toward democracy and a free market economy was established in Romania." *Id.* at 3. The new Romanian regime privatized that country's economy and "dis-solved state companies previously owned by the SRR and formed new shareholders commercial companies." *Id.* ADAS contends that pursuant to a 1990 Executive Order (the "Executive Order"), (Notice of Cross–Motion at Exh. D), "ADAS was dissolved by the Republic of Romania effective January 1, 1991." (ADAS Memo at 3.) The Executive Order divested ADAS of all of its assets and established three new companies to which ADAS's liabilities and assets were transferred. *Id.* These new companies are: (1) Astra S.A. ("Astra"); (2) Asigurarea Romaneasca S.A ("Asigurarea Romaneasca"); and (3) Carom S.A ("Carom"). *Id.* at 4. ADAS claims that its foreign reinsurance business was transferred to Astra, and that neither Asigurarea Romaneasca nor Carom have any connection to any of ADAS's transactions underlying the instant litigation. *Id.*

In support of its cross-motion for summary judgment, ADAS makes two arguments. First, ADAS contends that the Bucharest Judgment, which allegedly renders the Retrocession Agreement underlying Allstate's claims void, "is entitled to recognition and enforcement by this Honorable Court" under both New York law and the doctrine of international judicial comity. *Id.* at 5. Second, ADAS asserts that pursuant to the Executive Order issued by the new Romanian regime, it now lacks the capacity to be sued in an American court. *Id.* at 11. As noted above, ADAS brought the instant cross-motion as part of its opposition to Allstate's motions to amend its complaint and to compel defendants to file pre-answer security. In the 1995 Opinion, this Court granted Allstate's motion to amend its complaint, and denied Allstate's motion to compel defendants to file pre-answer security. *See Allstate,* 875 F.Supp. at 1030. This Court, however, did not expressly address ADAS's cross-motion for summary judgment in rendering those determinations.

■ In granting Allstate's motion to amend its complaint, this Court found that "ADAS['s] claims that a judgment from a court in Bucharest and an executive order of the Republic of Romania bar Allstate from asserting any claim against Astra S.A .... [were] without merit." *Id.* at 1029. That

finding, however, was made in the context of this Court's adjudication of Allstate's motion to amend its complaint. In that context, this Court observed that ADAS's claims based on the Bucharest Judgment and the Executive Order "address[ed] the merits of Allstate's claim," and that "arguments that address the merits are not relevant to a motion for leave to amend the pleadings." *Id.* (citations omitted). This Court's statement that these arguments were "without merit," therefore, pertained only to the issue of whether Allstate should be permitted to amend its complaint, not to the merits of the claims Allstate alleges in its complaint.

As a result, this Court has yet to consider the effect of the Bucharest Judgment and the Executive Order upon the merits of Allstate's claims against ADAS. Because these issues have never been considered, they do not constitute the law of the case, *see Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979); 18 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure § 4478, at 789 (1981) ("questions that have not been decided do not become law of the case merely because they could have been decided"), and thus are properly resolved in the instant opinion.

## DISCUSSION

As a preliminary matter, this Court will set forth the legal standard controlling the resolution of ADAS's cross-motion for summary judgment.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the court that there

is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "[i]t has long been the rule that on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Lendino v. Trans Union Credit Info.* Co., 970 F.2d 1110, 1112 (2d Cir.1992) (quotation omitted).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

In considering a motion for summary judgment, a court is not to resolve contested issues of fact, but rather, it is to determine the existence of any disputed issues of material fact. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air Int'l, Inc. v. British Caledonian Group,* 867 F.Supp. 262, 266 (S.D.N.Y.1994), *aff'd,* 81 F.3d 1224 (2d Cir.1996). Indeed, "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam). To evaluate a fact's materiality, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight,* 804 F.2d at 11–12. According to the Supreme Court, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted). Nevertheless, "courts should not be reluctant to grant summary judgment in appropriate cases." *A.F.L. Falck S.p.A. v. E.A. Karay Co., Inc.,* 722 F.Supp. 12, 15 (S.D.N.Y.1989). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, thereby permitting courts to avoid "protracted, expensive and harassing trials." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

## II. ADAS'S MOTION

To reiterate, ADAS advances two arguments in support of its cross-motion for summary judgment: (1) that this Court should recognize the Bucharest Judgment which allegedly voids the Retrocession Agreement upon which Allstate's claims are based; and (2) pursuant to the Executive Order, ADAS lacks the capacity to be sued. This Court will consider each of these arguments individually.

### A. The Bucharest Judgment

ADAS asserts that the Bucharest Judgment "declare[s] null and void *ab initio* the agency and reinsurance agreements" underlying Allstate's claims against ADAS, and that "[u]nder New York law and the doctrine of international judicial comity," that judgment is entitled to recognition and enforcement by this Court. (ADAS Memo at 5.) This argument implicates this Court's ability to recognize the judgments of foreign judicial entities.

Unlike judgments of American state courts which are enforced domestically with full faith and credit, see U.S. Const. Art. IV, § 1; 28 U.S.C. § 1738 (1994) (implementing the Full Faith and Credit Clause), there is no comparable "international full faith and credit clause." *See Aetna Life Ins. Co. v. Tremblay,* 223 U.S. 185, 190, 32 S.Ct. 309, 310, 56 L.Ed. 398 (1912). Moreover, neither Congress nor the Executive branch has provided such authority in the form of legislation or treaties governing the recognition of foreign judgments. *See* Ronald A. Brand, *Enforcement of Foreign Money–Judgments in the United States: In Search of Uniformity and International Acceptance,* 67 Notre Dame L.Rev. 253, 257–58 (1991). Thus lacking constitutional, congressional or executive guidance, American courts have been uncertain in their approach to the enforcement of foreign judgments. *Id.* at 255. Instead, the law has developed both through the state and federal common law, as well as through recent state-law codifications.

■ Because this litigation arises under this Court's diversity jurisdiction, *see Allstate,* 948 F.Supp. at 296, this Court must apply the law of the state in which it sits, New York, to its consideration of whether to enforce the Bucharest Judgment. *See Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F.Supp. 609, 615 (S.D.N.Y.1991) ("New York law governs actions in New York to enforce foreign judgments") (citation omitted); *Choi v. Kim,* 50 F.3d 244, 248 n. 7 (3d Cir.1995) ("the consensus among the State courts and lower federal courts which have passed upon the question is that, apart from federal question cases, such recognition [of foreign judgments] is governed by State law and that the federal courts will apply the law of the State in which they sit").

■ By enacting Article 53 of the New York Civil Practice Law and Rules ("Article 53"), New York became one of the twenty-seven states which have adopted versions of the Uniform Foreign Money–Judgments Act, 13 U.L.A. 263 (1986). 7B N.Y. Civ. Prac. L. & R. §§ 5301–09 (Table) (McKinney 1997 Supp.). ADAS argues that, pursuant to Article 53, this Court should enforce the Bucharest Judgment. (ADAS Memo at 5–9.)

ADAS's reliance upon Section 53 is misplaced, however, because that section is, by its terms, applicable only to foreign money-judgments. Section 5301 specifically defines the term "foreign country judgment" as "any judgment of a foreign state granting or denying recovery of *a sum of money*, other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters." 7B N.Y. Civ. Prac. L. & R. § 5301(b) (McKinney 1997 Supp.) (emphasis added). The Bucharest Judgement is, by contrast, a judgment which allegedly nullifies a contract, not one which awards money. *See* (Notice of Cross–Motion at Exh. C.) As a result, Article 53 does not provide authority for this Court to enforce the Bucharest Judgment.

■ At common law, however, there is an another potential avenue for the enforcement of the Bucharest Judgement. Under the "the comity of nations," courts may give force to foreign judgments, and enforcement is not limited to foreign money judgments. See *Canadian Imperial Bank v. Pamukbank Tas,* 166 Misc.2d 647, 650–51, 632 N.Y.S.2d 918, 920–21 (N.Y.Sup.Ct.1994) (applying principles of comity to, but ultimately not enforcing, a Turkish court order restraining a New York bank from complying with a letter of credit); *Lasry v. Lasry,* 180 A.D.2d 488, 489, 579 N.Y.S.2d 393, 393–94 (N.Y.App.Div.1992) (enforcing, on grounds of comity, a Swiss court's injunction freezing defendant's bank account).

The seminal case in the area of enforcement of foreign judgments, *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), explained the doctrine of comity as follows:

No law has any effect ... beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the "comity of nations." ... Comity, in the legal sense, is neither a matter of absolute obligation on the one

hand, nor a mere courtesy and good will upon the other. But it is a recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of persons under the protection of its laws. *Id.* at 163–64, 16 S.Ct. at 143. In New York, courts "generally will accord recognition to the judgments rendered in a foreign country under the doctrine of comity absent a showing of fraud in the procurement of the foreign judgment or unless recognition of the foreign judgment would offend a strong policy of New York." *Lasry,* 180 A.D.2d at 489, 579 N.Y.S.2d at 393–94; (citation omitted); *see also Canadian Imperial Bank,* 166 Misc.2d at 651, 632 N.Y.S.2d at 921. The Restatement (Second) of Conflict of Laws relies upon *Hilton* to shed more light on the standards controlling the enforcement of foreign judgments:

A foreign nation judgment will not be recognized in the United States unless the American court is convinced that the foreign court had jurisdiction and that there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws in which it is sitting, or fraud in procuring the judgment ... *Hilton v. Guyot,* 159 U.S. 113, 202, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895). If these conditions are met, the judgment will not be refused recognition on the ground that the rendering court made an error of law or fact.

Restatement (Second) of Conflict of Laws § 98, cmt. c (1971).

■ In the case at bar, ADAS contends that the Bucharest Judgment is enforceable, and asserts that "[e]nforcement of the Bucharest ... Judgment ... would not prejudice the interests of the United States or

violate any aspect of its public policy." (ADAS Memo at 10–11.) In addition, ADAS maintains that the Bucharest court possessed jurisdiction over Allstate because the Bucharest litigation named SLR and the Northbrook Excess and Surplus Insurance Company ("NESCO") as defendants, and Allstate is SLR's assignee and NESCO's successor-in-interest. *Id.* at 3; *see also Allstate,* 948 F.Supp. at 290–91. ADAS contends that SLR "defaulted in appearance" in the Bucharest action, and that NESCO was "voluntarily dismissed" because it had no contractual privity with ADAS. (ADAS Memo at 3.)

Allstate opposes ADAS's position that the Bucharest court possessed personal jurisdiction over Allstate through NESCO and SLR. Specifically, Allstate maintains that: "at a minimum ... the Bucharest Court did not have personal jurisdiction over the parties"; "[SLR] did not answer or otherwise appear in the action"; "NESCO appeared in the action only to object to jurisdiction and that ADAS voluntarily dismissed NESCO from the action"; "the [Bucharest] court had no jurisdiction over Allstate, NESCO or [SLR], misapplied New York law, rendered findings based solely on ADAS's allegations, and issued a judgment that violated New York's public policy." (Response of Allstate Insurance Company to Administratia Asigurarilor de Stat's Civil Rule 3(g) Statement, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 ("Allstate 3(g) Statement") ¶¶ 6–10 (May 24, 1993).)

To reiterate, in order to prevail on summary judgment, the moving party must demonstrate the absence of a disputed issue of material fact. *See* Fed.R.Civ.P. 56(c). In considering such a motion, the court is to draw inferences "from the underlying facts contained in [the moving party's] materials ... in the light most favorable to the party opposing the motion." *Lendino,* 970 F.2d at 1112. In the instant case, this Court finds that ADAS has failed to carry its summary judgment burden. Based on ADAS's submissions, this Court cannot determine with any certainty the existence of several of the prerequisites to enforcing the Bucharest Judgment on comity grounds. For example, this Court has nothing but the parties' conflicting statements—neither of which is submitted with evidentiary support—that the Bucharest Court possessed jurisdiction over Allstate. In addition, the Bucharest Judgment was allegedly entered in 1983, long before the Romanian government was democratized, and therefore this Court cannot find that the Bucharest Judgment was achieved "under a system of jurisprudence likely to secure an impartial administration of justice," Restatement (Second) of Conflict of Laws § 98 cmt. c, especially because ADAS has submitted no evidence upon which this Court could base such a finding. As a result, this Court finds that ADAS has failed to demonstrate that the Bucharest Judgment should be enforced under the principles of comity.

### B. The Executive Order

ADAS asserts that pursuant to the Romanian government's Executive Order ADAS was dissolved and can no longer sue or be sued. (ADAS Memo at 11.) Effective January 1, 1991, the assets and liabilities which appeared on ADAS's balance sheet as of December 31, 1990, were assumed by the Asigurarea Romaneasca, Astra and Carom entities. *Id.* at 11–12. ADAS submits an affidavit of Mr. Victor Anagnoste ("Anagnoste"), a purported expert in Romanian law, which asserts that pursuant to Article 40 of Romanian Law No. 31, ADAS had no capacity to sue or be sued after January 1, 1991, the effective date of its dissolution. (ADAS Memo at 12); (Affidavit of Victor Anagnoste, *Allstate v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 ("Anagnoste Aff.") ¶ 11 (Mar. 22, 1993).) According to Anagnoste, under Romanian law, "ADAS ceased to exist as a juridical entity on the day of its dissolution." (Anagnoste Aff. ¶ 11); (ADAS Memo at 12.) In light of the Executive Order, ADAS argues that the "act-of-state doctrine," compels this Court to grant judgment to ADAS because the Executive Order eliminated ADAS's capacity to be sued. *Id.* at 12–13.

In *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), Chief Justice Fuller set forth the classic statement of the act of state doctrine:

Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Underhill*, 168 U.S. at 252, 18 S.Ct. at 84; *see also* 1 Restatement (Third) of Foreign Relations Law § 443 (1988). In *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the second landmark act of state doctrine decision, the Supreme Court explained the doctrine's basis. Justice Harlan reasoned that the act of state doctrine is not compelled by principles of international law, sovereign authority, or the United States Constitution. *Sabbatino*, 376 U.S. at 421–24, 84 S.Ct. at 936–38. Instead, the doctrine

arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of foreign relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals [in foreign relations].

*Id.* at 423, 84 S.Ct. at 938.

 The act of state doctrine "is not a jurisdictional limit of courts," *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993), but rather is "a prudential doctrine designed to avoid judicial action in sensitive areas." *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir.1989) (quotation omitted), *cert. dismissed*, 497 U.S. 1058, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). Moreover, the doctrine is a principle of federal law which is "binding on federal and state courts alike," and which therefore applies even in cases of diversity jurisdiction. *See Sabbatino*, 376 U.S. at 426–27, 84 S.Ct. at 939–40. In addition, the

burden of establishing the applicability of the act of state doctrine rests on its proponent. *See Galu v. Swissair, Swiss Air Transport Co., Ltd.*, 873 F.2d 650, 653 (2d Cir.1989). "At a minimum, this burden requires that a party offer *some evidence* that the government acted in its sovereign capacity and *some indication* of the depth and nature of the government's interest." *Liu*, 892 F.2d at 1432 (emphasis added).

 In the case at bar, this Court finds that ADAS has not established that the act of state doctrine renders ADAS immune from suit in an American court. The only evidentiary item proffered by ADAS in support of its position is the Anagnoste Affidavit. That affidavit, however, speaks solely in conclusory terms. For example, it asserts that "[p]ursuant to Romanian Law No. 31, of January 30, 1954, regarding the status of juridical persons, ADAS clearly lacks capacity to sue or standing to be sued after the effective date of its dissolution, January 1, 1991," (Anagnoste Aff. ¶ 11), but provides no supporting rationale for this statement. Such legal conclusions, even when offered by a competent expert witness, cannot provide the basis for a grant of summary judgment. *See* 11 James W. Moore, *Moore's Federal Practice* § 56.14[1][e][i], at 56–167 (3d ed.1997) (citing *Reinke v. O'Connell*, 790 F.2d 850, 851–52 (11th Cir.), *reh'g denied*, 797 F.2d 982 (1986) (physicians' affidavits stating merely that they were not guilty of malpractice were conclusory and not sufficient to support motion for summary judgment)).

Moreover, in his affidavit Anagnoste does not set forth the underlying facts and methodologies used in drawing his conclusions concerning the Executive Order. Although Anagnoste states that he "reviewed all the pleadings, briefs, service of process, orders of court" with respect to the Bucharest Judgment, and is "fully familiar with the facts and applicable law in the litigation commenced by ADAS in 1981 against various defendants in the Court in the City of Bucharest," (Anagnoste Aff. ¶ 2), these assertions pertain solely to his opinions concerning the enforceability of the Bucharest Judgment, not to the Executive Order allegedly dissolving ADAS. It is well-settled that an "expert is required to inform the court of the facts and reasons

from which the expert's opinion was derived so that the court can look behind the expert's 'ultimate conclusion' ... and analyze the adequacy of its foundation." 11 Moore § 56.14[1][e][i], at 56–170 (quoting *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989) (citation omitted)). Here, Anagnoste's affidavit provides only his "ultimate conclusion," without explaining the facts and reasons from which that conclusion was derived. As a result of these omissions, this Court finds that the Anagnoste Affidavit is an inadequate foundation upon which to base a grant of summary judgment.

■ Moreover, neither the Anagnoste Affidavit nor any other ADAS submission addresses the crucial issue of the Romanian or the American governments' respective foreign relations interests in this Court's not including ADAS as a defendant in this litigation. *See Liu*, 892 F.2d at 1432. Simply put, ADAS has not met its burden in establishing the applicability of the act of state doctrine to this case. Accordingly, this Court finds that ADAS's motion for summary judgment should be denied.

## CONCLUSION

IT IS HEREBY ORDERED THAT ADAS's motion for summary judgment is DENIED.

SO ORDERED.