**S.C. CHIMEXIM S.A., Plaintiff,**

v.

**VELCO ENTERPRISES LTD.,**
**et al., Defendants.**

**No. 98 CIV. 0142(DC).**

United States District Court,
S.D. New York.

March 12, 1999.

Amended March 16, 1999.

Law Offices of Radu Herescu, by Radu Herescue, Mark E. Schaefer, New York City, for Plaintiff.

Zeldes, Needle & Cooper, P.C. by David P. Friedman, Diane M. Juffras, Bridgeport, CT, for Defendants.

CHIN, District Judge.

In this diversity case, plaintiff S.C. Chimexim S.A. ("Chimexim") seeks to enforce a $201,087 judgment rendered in its favor by a tribunal in Bucharest, Romania (the "Bucharest Judgment") against. defendant Velco Enterprises, Ltd ("Velco").[1] Velco moves to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). Chimexim opposes the motion and cross-moves for summary judgment. One issue raised by the cross-motions is whether the Romanian judicial system comports with the requirements of due process.

For the reasons set forth below, Velco's motion to dismiss the complaint is denied and Chimexim's cross-motion for summary judgment enforcing the Bucharest Judgment is granted.

## BACKGROUND

I provide summaries of (a) Romania's government and judiciary; (b) the underlying facts in this case; (c) the proceedings in Romania; and (d) the proceedings in this Court.

### A. *Romania*[2]

#### 1. *The Government*

Romania, a country in southeastern Europe, became an independent nation in 1878.

---

1. Chimexim names Velco Enterprises, Ltd., Euronetics, Inc. (f/k/a Velco Enterprises, Ltd.), and Velco Chemicals, Inc. (d/b/a Velco Enterprises. Ltd.) as defendants in this case. In a conference on July 21, 1998, I decided that Velco Chemicals need not answer Chimexim's complaint pending a decision on the other defendants' motion to dismiss. Although Velco Chemicals *does not appear* on this motion, I refer to defendants collectively as "Velco."

2. Unless otherwise indicated, the facts in this section are drawn from the materials submitted

It became a kingdom in 1881 and adopted a constitution in 1923, thereby becoming a constitutional monarchy. In the late 1930's, however, the parliament was dissolved and Romania came under authoritarian rule. The Communists formally took power in 1947 and continued to rule until 1989.

In 1989 the Romanian army joined in a popular uprising against the Communist regime and President Nicolae Ceausescu was deposed and executed. Thereafter, a provisional government was established with Ion Iliescu, a former Communist, as president. In May 1990, multiparty elections were held and a president and national legislature were voted into office. Iliescu was elected president, and his party, the National Liberation Front ("NLF"), gained control of the legislature.

In December 1991, a new constitution was approved by popular referendum. The constitution declared Romania to be a parliamentary republic and provided for multiple political parties, a separation of powers between branches of government, a market economy, and respect for human rights. Romanian military, police, and intelligence structures eventually were put under civilian control.

In November 1996, general elections were held for the third time since the 1989 revolution. The coalition that had been in power since the revolution was voted out and replaced by a "new reform-minded Prime Minister." Kingston, at 360. The new government "is implementing a very ambitious and aggressive economic program aimed at a rapid culmination of privatization and restructuring of the Romanian economy." Geoana, at 16. Recent new laws include an "Emergency Ordinance" that seeks to encourage investment in Romania by establishing certain protections for foreign investors, Kingston, at 361, a Copyright Law that is designed to conform to the standards of the Berne Convention and the world Trade Organization, *Romania Enacts Copyright Law,* 8 No. 6 J. Proprietary Rts. 24, 24 (1996), and tax laws intended to help Romania adapt to a free market economy. Mihaela Grama and Nicholas S. Hammond, *Romania's Tax System Evolves with the Free Market Economy,* 4 J. Int'l Tax'n 276, 276 (1993).

### 2. *The Judiciary*

During Romania's Communist period, "individual justice was subservient to the state's goal of creating a communist society, and judges were merely instruments of the state." Judicial Review, at 1. After the ouster of the Communist regime in 1989, the judicial system underwent significant reform.

The 1991 Constitution established Constitutional and Supreme courts in Romania, and a Judiciary Law passed in 1992 established three levels of courts beneath the Supreme Court. The Judiciary Law also created the "formal mechanism for the administration of justice." Judicial Review at 1; *see also id.* at 1–4 (explaining the structure and jurisdiction of the various courts as well as the administration of the courts). The Constitution and the Judiciary Law also "explicitly set forth the independence of the judiciary." *Id.* at 8. Indeed, the "judiciary is now a legally independent branch of government" in Romania. *Id.*

Romanian judges are "typically selected from among the most outstanding recent graduates of the law schools." *Id.* at 4–5. In addition to passing an examination, Romanian judges must: have a law degree, a good reputation, and no criminal record; be physically capable: of fulfilling the required judicial functions; know the Romanian language; and be Romanian citizens with permanent residences in Romania. *Id.* at 4; *see also id.* at 5–8 (detailing judges' appointment process, training, ethics requirements, discipline, compensation, and immunity).

by the parties as well as the following: Mircea Geoana, *Romania: Euro–Atlantic Integration and Economic Reform,* 21 Fordham Int'l L.J. 12 (1997) ("Geoana"); Andrew B. Kingston, *Romania,* 32 Int'l Law. 360 (1997) ("Kingston"); Daniel N. Nelson, *Romania,* Encarta Multimedia Encyclopedia (Microsoft 1997); Judicial Overview of Central and Eastern Europe by the American Bar Association Central and East European Law Initiative (CEELI) (1996) (hereinafter "Judicial Review"); John W. Van Doren, *Romania: Ripe for Privatization and Democracy? Legal Education as a Microcosm,* 18 Hous. J. Int'l L. 113 (1995).

## B. *The Underlying Facts* [3]

Chimexim is a Romanian corporation with principal offices located in Bucharest Romania. Velco is a Connecticut corporation with its principal place of business in New York. In addition, at relevant times to this suit, Velco had a "Representative Office" in Romania, which was authorized by the Ministry of Foreign Trade Organization Department to do business in Romania. (DX 1 (Goldschneider Aff. Ex. A)). The Authorization states that Velco's principal place of business is New York and that the scope of activity of the Representative Office is "to support the trading activity of Velco[ ] in Romania concerning the import and export of chemical products." (*Id.*). The Representative Office was staffed by an office manager, two secretaries, and a messenger, and it was open approximately forty hours a week.[4] (DX 2 (Grigore Aff.)).

Chimexim and Velco are in the business of purchasing, selling, and distributing industrial chemicals, plastics, and related raw materials. Chimexim and Velco bought and sold various products from and to one another. This case arises from a transaction involving Chimexim's sale of polyvinylchloride ("PVC") to Velco.

Chimexim apparently performed its end of the bargain but was not paid in full by Velco. Thus, in 1991, Chimexim and Velco entered into an "Agreement" that purported "to settle" Velco's outstanding invoices in the amount of $307,000. (DX 1 (Ex. B); PX 9). The Agreement provided that: (1) Velco would pay $75,000 to Chimexim the week of October 21, 1991; (2) the $232,000 balance would be discharged by Velco to Chimexim based on "developments [of] bilateral business between the two companies"—each company agreeing to sell each other's products at competitive prices, and Velco promising to reserve a 3% commission to Chimexim

on its purchases and sales; and (3) when Velco reached a settlement with one of its Brazilian clients, concerning non-delivery of PVC that affected Velco's agreement with Chimexim, Chimexim and Velco would "discuss a fair basis [for] their respective final settlement." (*Id.*).

Velco paid Chimexim $75,000 as set forth in the Agreement. Chimexim contends that Velco failed to adhere to the remaining terms of the Agreement. Velco contends that the Agreement precluded Chimexim from pursuing claims against it in Romania.

## C. *Proceedings In Bucharest*

On January 25, 1996, Chimexim's attorney in Bucharest apparently served a "Notification" on Velco demanding payment of $201,-087 under the Agreement. (PX 12). The Notification stated that if Velco did not pay said amount to Chimexim by February 16, 1996, the "debtor will be prosecuted, according to the Romanian legislation, with all consequences arising from this regarding compensation[ ] and expenses." (*Id.*). Velco neither admits nor denies receiving the Notice,[5] but it is undisputed that Velco did not remit payment.

On June 19, 1996, Chimexim brought suit against Velco in Romania before the Bucharest Tribunal, Commercial Section (the "Tribunal"), to recover the unpaid balance on the PVC transaction. (PX 5 (Balanescu Aff.)). Chimexim's application to the Tribunal stated the relevant facts discussed above, including information about the PVC transaction and the parties' Agreement to settle. (DX 5 (Teodorescu translation of Chimexim application to Tribunal)). The application also stated that Velco owed a balance of $201,087 on the $307,000 initially due to Chimexim under the Agreement. (*Id.*). Attached to the application were twenty-five documents submit-

---

3. Although the parties do not agree on all the facts, the material facts are not in dispute.

4. Velco contends that the Representative Office's function "was to facilitate Velco's transaction of business with Romanian companies .... [and was not] authorized to transact business on behalf of Velco." (*See* DX 1 (Goldschneider Aff. ¶ 11)). Chimexim alleges, on the other hand,

that the Representative Office initiated negotiations with it for the transaction at issue. (*See* Chimexim 56.1 Statement (mislabeled as a "3(g)" Statement) at ¶ 1; PX 19 (Liliac Aff.)).

5. An employee of Velco's Representative office declares only that the Office was never served with the summons or complaint relating to Velco and Chimexim. (*See* DX 2).

ted in support of the claim, including a copy of the Agreement. (*Id.*).

Chimexim served Velco at its Representative Office with a summons by posting the summons in the case on the Office's door. (PX 6 (Anagnoste Aff.)). Velco denies that it was properly served, and maintains that its Representative Office never received the summons.

Velco failed to appear before the Tribunal. Accordingly, on July 10, 1996, the Tribunal entered judgment against Velco in the amount of $201,087. In its judgment, the Tribunal concluded that Velco owed Chimexim $201,087 and that the "procedure was legally carried out." (*See* DX 5 (Teodorescu translation of Bucharest Judgment); PX 15 (Margareta translation of Bucharest Judgment stating that there was "complete legal procedure")). The judgment also stated that Velco was "legally summoned at the office of its representative in Romania." (PX 15). In addition. the judgment noted that the Tribunal analyzed "the proofs that have been produced for the cause, [and] considers the action of [Chimexim] as founded and is going to accept it as such to oblige [Velco] to pay the amount of $201.087 … according to the agreement concluded between the parties." (*Id.; see also* DX 5 (Teodorescu translation of Bucharest Judgment)).

Velco appealed the judgment to Bucharest's Court of Appeal. In its appeal, Velco asserted four grounds for reversal: (1) the "introductory application" (or initial pleading) was insufficiently "stamped" (noting that the application did not make reference to the applicable law or invoke the proper grounds and was not filed with the sufficient number of stamps); (2) insufficient service of process (noting that the proof of service carried neither "the seal of Velco[ ] nor the signature of any employee of the Representative Office, although the above-mentioned headquarters were permanently manned"); (3) lack of personal jurisdiction because only the Representative Office was allegedly served and it "cannot validly represent Velco[ ] in court"; and (4) the Tribunal "mistakenly settled the case, without actually investigating the merits of the dispute and by breaching [certain provisions of Romania's] Civil Code" (arguing

*inter alia* that the Agreement barred the suit). (DX 1 (Ex. C)). A hearing on Velco's appeal took place on May 5, 1997. (PX 17).

In a written decision dated May 19, 1997, the three-judge panel of the Court of Appeal rejected Velco's appeal and affirmed the Tribunal. The Court of Appeal stated that it considered the following in rendering its decision: (1) Chimexim's claim that Velco owed it $201,087, and the documents submitted by Chimexim to support its claim; and (2) each of Velco's four grounds of appeal. (*Id.*). The Court of Appeal concluded that "the criticism against the award is unfounded and the appeal groundless." In so concluding, the Court of Appeal stated that it: (1) rejected Velco's argument concerning the insufficiency of the stamping on the summons; (2) determined that service was proper; (3) agreed that the court had personal jurisdiction over the Representative Office "as long as the representative has legal personality and represents the interests of the parent company on the Romanian Territory"; and (4) rejected Velco's argument that the Tribunal did not investigate the merits of the claim. (*Id.*).

On October 2, 1998, Velco appealed to the Supreme Judicial Court of Romania. A hearing on that appeal was scheduled for February 4, 1999. Neither party has informed the Court as to the disposition, if any, of that appeal. Neither the Court of Appeal nor the Supreme Judicial Court stayed the execution of judgment.

## C. *Proceedings in this Court*

On January 1, 1998, Chimexim filed suit against Velco in this Court, seeking to enforce its Bucharest Judgment. An amended complaint was filed on April 10, 1998. The parties conducted discovery, limited to the question of jurisdiction. These motions followed.

## *DISCUSSION*

### A. *Applicable Law*

#### 1. *Comity*

■■■ The recognition of foreign judgments "is governed by principles of comity."

*Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F.Supp. 609, 615 (S.D.N.Y.1991) (quoting *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987)); *see also Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The seminal case in the area of enforcing foreign judgments, *Hilton v. Guyot,* explained the doctrine of comity as follows:

> No law has any effect ... beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, ... by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the "comity of nations"....
>
> "Comity" .... is the recognition which one nation allows within its territory to the ... judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of persons who are under the protection of its laws.

159 U.S. at 163–64, 16 S.Ct. 139. The Supreme Court in *Hilton* held that if the foreign forum provides a full and fair trial before a court of competent jurisdiction, "under a system of jurisprudence likely to secure an impartial administration of justice ... and there is nothing to show either prejudice ... or fraud in procuring the judgment," the judgment should be enforced and not "tried afresh." *Id.* at 202–03, 16 S.Ct. 139.

The practice of extending " 'comity whenever the foreign court ha[s] proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy,' has consistently been followed in this Circuit." *Pariente,* 771 F.Supp. at 615 (quoting *Victrix,* 825 F.2d at 713 and citing *Ackermann v. Levine,* 788 F.2d 830 (2d Cir.1986); *Cunard S.S. Co. v. Salen Reefer Servs. A.B.,* 773 F.2d 452 (2d Cir.1985); *Clarkson Co. v. Shaheen,* 544 F.2d 624 (2d Cir.1976)).

### 2. *New York Law—Article 53*

New York law governs actions brought in New York to enforce foreign judgments. *Canadian Imperial Bank of Commerce v.* *Saxony Carpet Co.,* 899 F.Supp. 1248, 1252 (S.D.N.Y.1995) (citing *In re Union Carbide Corp. Gas Plant Disaster at Bhopal,* 809 F.2d 195, 204 (2d Cir.), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987) and *Pariente,* 771 F.Supp. at 615), *aff'd,* 104 F.3d 352 (2d Cir.1996).

In New York, "courts 'generally will accord recognition to the judgments rendered in a foreign country under the doctrine of comity absent a showing of fraud in the procurement of the foreign judgment or unless recognition of the foreign judgment would offend a strong policy of New York.' " *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 962 F.Supp. 420, 425 (S.D.N.Y. 1997) (quoting *Lasry v. Lasry,* 180 A.D.2d 488, 579 N.Y.S.2d 393, 393–94 (1st Dep't 1992)). Indeed, New York has a "long-standing" tradition of "permitting the enforcement of [foreign] country money judgments." *Fairchild, Arabatzis & Smith, Inc. v. Prometco Co.,* 470 F.Supp. 610, 615 (S.D.N.Y. 1979) (citing *Island Territory of Curacao v. Solitron Devices, Inc.,* 489 F.2d 1313, 1318 n. 6 (2d Cir.1973), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974)); *see also Cowans v. Ticonderoga Pulp & Paper Co.,* 246 N.Y. 603, 159 N.E. 669 (N.Y.1927); David Siegel, Practice Commentaries, McKinney's Cons.Laws of NY, Book 7B, CPLR C5304:1, at 548 (McKinney's 1997) (describing New York as "generous" in the recognition of the judgments of foreign nations) (hereinafter "Siegel Commentaries").

New York has codified the principles of comity by statute as the "Uniform Foreign Money–Judgments Recognition Act," N.Y. C.P.L.R. ("CPLR") Article 53. Article 53 provides that "a foreign country judgment ... is conclusive between the parties to the extent that it grants or denies recovery of a sum of money." CPLR § 5303. The article applies to "any foreign country judgment which is final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal." CPLR § 5302.

■ A foreign country judgment is "not conclusive" if: (1) "the judgment was rendered under a system which does not provide

impartial tribunals or procedures compatible with the requirements of due process of law"; or (2) "the foreign court did not have personal jurisdiction over the defendant." CPLR § 5304(a). These bases of non-recognition preclude courts from recognizing the foreign judgment as a matter of law. Siegel Commentaries at 543–49; 11 Jack B. Weinstein *et al.*, New York Civil Practice ¶ 5304.01 (1998) (hereinafter "Weinstein CPLR").

A foreign country judgment "need not be recognized," however, if: (1) the foreign court did not have subject matter jurisdiction; (2) the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable a defense; (3) the judgment was obtained by fraud; (4) the cause of action violates public policy; (5) the judgment conflicts with another final and conclusive judgment; (6) the proceeding in the foreign country was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or (7) the foreign court was a seriously inconvenient forum for the trial of the action. CPLR § 5304(b). These bases of non-recognition are discretionary. Weinstein CPLR ¶ 5304.02 (1998)

A foreign country judgment "shall not be refused recognition for lack of personal jurisdiction" if, *inter alia:* (1) defendant was served in person in the foreign state; (2) defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized; (3) defendant had its principal place of business, was incorporated, or had otherwise acquired corporate status in the foreign state; or (4) defendant had a business office in the foreign state and the proceedings in the foreign court involved a cause of action arising out of business done by defendant in the foreign state. CPLR § 5305.

■ If any of the above bases for personal jurisdiction apply, "recognition [of the foreign judgment] may not be refused for lack of personal jurisdiction, although recognition may be refused on one of the discretionary grounds listed in [§ 5304(b) ]." Siegel Commentaries at 549.

### 3. *Burdens of Proof*

■ The burden of proof in "establishing the conclusive effect of a foreign judgment is on the party asserting conclusiveness." Weinstein CPLR ¶ 5302.01. As the Second Circuit has explained:

> [A] plaintiff seeking enforcement of a foreign country judgment granting or denying recovery of a sum of money must establish prima facie: (1) a final judgment, conclusive and enforceable where rendered; (2) subject matter jurisdiction; (3) jurisdiction over the parties or the res; and (4) regular proceedings conducted under a system that provides impartial tribunals and procedures compatible with due process.

*Ackermann v. Levine,* 788 F.2d 830, 842 n. 12 (2d Cir.1986) (citations omitted). Once a plaintiff establishes a prima facie case of enforceability, a defendant may then raise defenses such as fraud and public policy. *Id.* Although the *Ackermann* court did not specify how these burdens apply with respect to Article 53, as a matter of logic, it would appear that plaintiff has the burden of proving that no mandatory basis for non-recognition pursuant to CPLR § 5304(a) exists, and that defendant has the burden of proving that a discretionary basis for non-recognition pursuant to CPLR § 5304(b) applies.

### B. *Velco's Motion to Dismiss*

■ Velco moves to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2). Rules 12(b)(1) and 12(b)(2), however, are the "means for challenging the jurisdiction of the court before whom a matter is pending." *Canadian Imperial Bank of Commerce v. Saxony Carpet Co.,* 899 F.Supp. 1248, 1251 (S.D.N.Y.1995), *aff'd* 104 F.3d 352 (2d Cir.1996). Velco seeks to invoke these rules to challenge the jurisdiction of the Romanian court, *not* this Court. Thus, Velco's reliance on Rules 12(b)(1) and 12(b)(2) is erroneous and its motion to dismiss on these bases is denied. *See id.* (denying motion to dismiss).

Velco's motion to dismiss for failure to state a claim upon which relief can be granted is similarly denied. Accepting the allega-

tions of the amended complaint, *see Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996), it does not appear "beyond doubt that [Velco] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Indeed, Chimexim's allegations concerning the Bucharest Judgment clearly suffice to state a claim—the amended complaint states that Chimexim holds a final, conclusive and enforceable foreign judgment against Velco for monetary damages. (*See* Am. Cmplt. ¶¶ 20–24).

## C. Chimexim's Cross–Motion for Summary Judgment

■ Chimexim's's cross-motion for summary judgment raises three issues: (1) whether Chimexim has met its burden of showing that the Bucharest Judgment is final and executory under Romanian law; (2) if so, whether Chimexim has met its burden of showing that no mandatory basis for non-recognition exists; and (3) if so, whether Velco has met its burden of establishing that one of the discretionary exceptions for not recognizing a foreign judgment exists. These issues involve questions of both law and fact.

### 1. Finality

Velco contends that the Bucharest Judgment is not final, conclusive, and enforceable because it is on appeal to Romania's Superior Court. I reject the argument because the undisputed evidence in the record demonstrates the contrary. Three Romanian lawyers declare that the Bucharest Judgment is final and executory under Romanian law, notwithstanding Velco's latest appeal. (*See* PX 5 at ¶¶ 8–9; PX 6 at ¶ 8; PX 7 (Manzini Aff. ¶ C.4)). Moreover, Velco does not contest the fact that neither the Court of Appeal nor the Superior Court stayed execution of the Bucharest Judgement. Finally, Article 53 specifically states that it applies to judgments "even though an appeal therefrom is

pending or is subject to appeal." CPLR § 5302. Hence, there is no genuine issue of material fact as to presumptive validity of the Bucharest Judgment.

### 2. Chimexim's Contentions Concerning Recognition

Chimexim contends that this Court should enforce the Bucharest Judgment because: it was rendered under a system which provides impartial tribunals and procedures compatible with the requirements of due process of law, and because the Romanian courts had personal jurisdiction over Velco. Velco disagrees. I discuss these issues in turn.

### a. Impartial Tribunal and Due Process

■ The materials submitted to the Court as well as the Court's own research demonstrate that the Romanian judicial system comports with the requirements of due process. Velco's sweeping allegation that the Bucharest Judgment is unenforceable because the "Romanian judicial system is incompatible with due process" (Velco Mem. at 10) is rejected, as a matter of law. Because I conclude that the Romanian judicial system comports with the requirements of due process, I also conclude that there is no genuine issue of material fact in this respect for trial.

The record establishes the following:

First, the Romanian government and its judicial system have undergone extensive reform since the fall of the Communist regime in 1989 and the adoption of the Romanian Constitution in 1991. As one of Velco's own submissions observes:

> Six years after the fall of Ceausescu, Romania is a greatly changed society with many of the institutional features of democracy, a nascent capitalist economy, and an identifiable path toward gradual integration with Europe.

(Velco Mem. Ex. B (excerpt from Thomas Carothers, Assessing Democracy Assistance: The Case of Romania 15 (Carnegie Endowment for International Peace 1996) (hereinafter "Carnegie Assessment")).[6] Likewise, as another of Velco's submissions states:

---

**6.** The same study also observes, however, that "[a]t the same time, however, it lags badly behind many of its neighbors in clearly breaking

away from the Communist past." Carnegie Assessment at 15.

The Romanian Constitution contains basic due process guarantees, but the procedures necessary to implement these guarantees are not strictly followed. The Constitution provides free access to justice, procedural due process, and guarantees the right to the assistance of an attorney.... All persons are considered equal before the court and entitled to their day in court. There is some evidence that these guarantees are not always accorded. Under the Constitution, all parties to a judicial proceeding are provided with a right of appeal.

(*Id.* Ex. A Judicial Review at 9). *See also* Robert B. Yegge, 37 No. 3 Judges' J. 41 (1998) (detailing CEELI judicial reform efforts in Romania since 1991 and observing that "[t]here has been significant social and political change in Romania" since it democratized, and that U.S. assistance with judicial reform has succeeded).

Second, the Romanian judicial system now has the earmarks of an independent system that is capable of duly administering justice. There is a Constitution that sets forth certain due process guarantees, including procedural due process. There is a Judiciary Law that establishes the judiciary as an independent branch of government. There is judicial tenure for at least some judges. There are three levels of appellate review, and in the instant case Velco has taken advantage of that right to appellate review.

Third, as expert testimony submitted by Chimexim demonstrates, due process in fact is provided under Romanian law. Constantine I. Manzini, a Romanian lawyer who is also admitted to practice law in New York, declares that "Romania provides impartial tribunals as well as procedures compatible with the requirements of die process of law." (PX 7 at ¶ C.3). In the context of this particular case, Victor Anagnoste, a Romanian lawyer who is president of the Romanian Bar Association, declares that "[d]ue process and procedures compatible with the requirements of due process were accorded to defendant." (PX 6 at ¶ 3b). Velco failed to submit any expert opinion suggesting that Romanian tribunals are not impartial or that Romanian civil courts do not provide litigants with due process.

Finally, the United States entered into a trade relations treaty with Romania in 1992, which provided that:

[n]ationals and companies of either [the United States or Romania] shall be accorded national treatment with respect to access to all courts and administrative bodies in the territory of the other [country], as plaintiffs, defendants or otherwise. They shall not claim or enjoy immunity from suit or execution of judgment, proceedings for the recognition and enforcement of arbitral awards, or other liability in the territory [of either country] with respect to commercial transactions.

(*See* PX 8). The language of the trade agreement demonstrates that the United States was willing to recognize Romania's judicial system.

On the basis of this record, which includes the unrebutted affidavits of Chimexim's expert witnesses, I can only conclude that' Chimexim has met its burden of demonstrating that the Romanian judicial system comports with the requirements of due process.

As noted, the record does demonstrate that the Romanian judicial system is far from perfect. As Velco points out, "corruption remains a concern" in Romania and there "is some evidence that [due process] guarantees are not always accorded."[7] No judicial system operates flawlessly, however, and unfortunately injustices occur from time to time even in our own system. Velco's general (and conclusory) assertions are not sufficient to create a genuine issue of fact that Roma-

---

7. *See also* Carnegie Assessment at 53 ("Since 1989, the rule of law in Romania has improved significantly. Serious shortcomings do remain, however, including: illegal behavior, particularly corruption by government officials; a common attitude at the higher levels of the power structure that the government and the state are above the law; and only weak institutional reform processes concerning both the law-making and law-enforcing processes. The judicial system has undergone partial reforms, including the creation of a Superior Council of Magistrates, the restoration of the pre-communist-era appeals courts, and the establishment of judicial tenure for at least some judges. Yet major problems remain.").

nia's judicial system as a whole is devoid of impartiality or due process.[8]

### b. *Personal Jurisdiction*

Chimexim also contends that the Bucharest Judgment is entitled to recognition because the Bucharest courts had personal jurisdiction over Velco. I agree. Pursuant to CPLR § 5305(a), at least three separate bases existed for the Tribunal to exercise jurisdiction over Velco in Romania.

### 1) *Voluntary Appearance*

■ First, Velco voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or protesting jurisdiction. CPLR § 5305(a)(2); Siegel Commentaries at 556. Velco contends that its appeal from the Bucharest Judgment does not constitute a voluntary appearance. Velco is mistaken.

One of Velco's arguments on appeal concerned the merits of the underlying dispute. Velco argued that the Tribunal "mistakenly settled the case, without actually investigating the merits of the dispute and by breaching [certain provisions of Romania's] Civil Code." (DX 1 (Ex. C)). Because it appeared in the Romanian proceedings in part to attack the Bucharest Judgment on the merits, Velco cannot now complain that the Romanian courts did not have personal jurisdiction over it. "If the judgment debtor did any more than [it] had to do ... to preserve [a] jurisdictional objection in the foreign court, [it] would thereby have submitted voluntarily to its jurisdiction and forfeited the right to claim an exception." Siegel Commentaries at 556; *see also* PX 18 (Manzini Supp. Legal Opinion at 3–4, 6).

On this basis alone, Chimexim has met its burden of proving that the Romanian courts had personal jurisdiction over Velco. After all "[i]f any one of [the bases for personal jurisdiction listed in CPLR § 5305(a) is] present, recognition may not be refused for lack of personal jurisdiction." Siegel Commentaries at 549.

### 2) *Corporate Status & Cause of Action Arising from Foreign Office*

■ Even were I to conclude that Velco did not voluntarily aooearm I would still find that personal jurisdiction was proper because: (1) Velco's Representative Office had acquired a corporate status in Romania (CPLR § 5304(a)(4)); and (2) Velco had a business office in Romania and the underlying dispute "involved a cause of action arising out of business done by [Velco] through that office" in Romania. CPLR § 5304(a)(5).

It is undisputed that Velco's Representative Office was authorized to do business in Romania by Romania's Ministry of Foreign Trade Organization Department. (DX 1 (Ex. A)). Thus, Velco acquired a "corporate status" in Romania, even though its principal place of business was New York and it was incorporated in Connecticut. (*See generally* PX 6, 7, 18). Velco's Representative Office was registered in Romania and was authorized to "to support the trading activity of Velco[ ] in Romania concerning the import and export of chemical products." (DX 1 (Ex. A).

In addition, Chimexim's claim against Velco arose out of business done by Velco *through* its foreign office. The purchase orders for the PVC transaction state that they were "conveyed through Velco Bucharest." (PX 7 (Exs. 3 and 4)). Velco itself admits in its reply memorandum that the PVC purchase orders were "transmitted, in the first instance through the representative office...." (Velco Reply Mem. at 11). Velco

---

8. Velco also states that there are "no cases involving ... recognition of judgments issuing from former Soviet-bloc nations, much less Romania." (Velco Mem. at 13). Likewise, however, there are no cases involving *non*-recognition of Romanian judgments on the basis that its courts deny litigants due process. Although a judge in this district denied summary judgment enforcing a Bucharest judgment, the court did so on the ground that issues of fact existed. *See Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 962 F.Supp. 420, 426 (S.D.N.Y.1997) (hold-ing that "this Court cannot determine with any certainty .... that the Bucharest Court possessed jurisdiction"); *see also Reinsurance Co. of America Inc. v. Administratia Asigurarilor De Stat*, No. 83 C 4682, 1985 WL 749 (N.D.Ill.1985) (declining to enforce Romanian judgment, prior to Romania's democratization, because court concluded that party against whom judgment was being offered was not subject to personal jurisdiction). Moreover, the *Allstate* judgment was allegedly entered in 1983, "long before the Romanian government was democratized." *Id.*

urges the Court to consider its Representative Office—which was open approximately forty hours a week, and staffed by four full-time individuals—to have functioned "as no more than a messenger." (*Id.*). The undisputed facts demonstrate the contrary, and no reasonable factfinder could conclude otherwise on this record. (*See also* PX 18 at 6; PX 19 (Liliac Aff.)).

Accordingly, the Romanian courts had at least three valid bases for exercising personal jurisdiction over Velco.

In short, Chimexim has met its burden of proving that no mandatory basis exists for not recognizing the Bucharest Judgment.

### 3. *Velco's Contentions Concerning Non–Recognition*

Velco contends that this Court should exercise its discretion to deny enforcement of the Bucharest judgment because: (a) the Romanian courts did not have subject matter jurisdiction; (b) the Bucharest Judgment is contrary to the parties' 1991 Agreement; and/or (c) Velco did not receive notice in sufficient time to enable it to defend. Each of these contentions is rejected.

The Romanian courts had subject matter jurisdiction over the underlying case, and Velco offers no valid argument or evidence to the contrary. (*See generally* PX 6, 7, 18). Likewise, the Bucharest Judgment does not conflict with the parties' 1991 Agreement. The Agreement nowhere states that Chimexim was precluded from bringing suit against Velco. Moreover, the issue as to whether the Agreement barred suit was specifically raised by Velco on appeal and rejected. Finally, I do not accept Velco's contention that it did not receive notice in sufficient time to enable it to defend. Even accepting Velco's contention that its Representative Office did not receive the summons, the evidence presented demonstrates that Velco mounted a vigorous defense against the Tribunal's decision on appeal, and that the Court of Appeal duly considered its arguments. The Court of Appeal, however, was unpersuaded and determined that the evidence presented warranted an affirmance of the Tribunal's decision. I will not second-guess that determination.

## CONCLUSION

For the reasons set forth above, Velco's motion to dismiss is denied and Chimexim's cross-motion for summary judgment is granted. The Bucharest Judgment will be granted comity. The parties shall appear for a conference on April 2, 1999 at 10:00 A.M. in Courtroom 11A at 500 Pearl Street.

SO ORDERED.