[743 NYS2d 408]

# CIBC Mellon Trust Company et al., Respondents, v Mora Hotel Corporation N.V. et al., Appellants.

First Department, May 28, 2002

## APPEARANCES OF COUNSEL

*Leon P. Gold* of counsel (*Bart Schectman, Karen E. Clarke* and *Karen D. Coombs* on the brief; *Proskauer Rose LLP,* attorneys), for respondents.

*Gideon Cashman* of counsel (*Jamie M. Brickell, Lisa M. Buckley* and *Benjamin K. Semel* on the brief; *Pryor Cashman Sherman & Flynn LLP,* attorneys), for appellants.

## OPINION OF THE COURT

SAXE, J.

This appeal requires this Court to consider what circumstances are sufficient to grant recognition and enforcement of a money judgment issued by an English court, where the defendants are Netherlands Antilles corporations doing business in New York that maintained no presence in England and appeared only for the purpose of contesting personal jurisdiction.

FACTS

The legal claims that form the basis for the judgments at issue here relate to the financial collapse of Castor Holdings Ltd., a Canadian real estate and financial investment company that declared bankruptcy in 1992. Plaintiff CIBC Mellon Trust Company, acting as the trustee of several trust funds, and plaintiff DaimlerChrysler Canada Inc. both invested, and lost, millions of dollars in Castor Holdings investments. They commenced legal proceedings in the English High Court of Justice, Chancery Division, alleging that they had been defrauded into these investments in what amounted to a massive, multinational fraud. Named as primary defendant in the English proceeding was Wolfgang Otto Stolzenberg, the president, chief executive officer and chairman of Castor Holdings, who is alleged to have orchestrated the fraud.[1]

In addition to three other individual defendants named in the English proceeding, plaintiffs ultimately named 47

---

1. Indeed, in April 2000, Stolzenberg was indicted in Canada for 41 counts of fraud relating to Castor's collapse.

corporate defendants, including the two defendants in the present proceeding, Mora Hotel Corporation N.V. (Mora) and Chascona N.V. (Chascona). Mora is the ground lessee and operator of the Gorham Hotel, located at 136 West 55th Street in Manhattan, and Chascona is the fee owner of the property; they are both Netherlands Antilles corporations authorized to do business in New York. One of the named individual defendants in the English action, Marco Gambazzi, is a Swiss attorney who owns and controls defendants Chascona and Mora Hotel Corporation; he also served as a director of Castor Holdings and managing director of Castor's principal lending subsidiaries, CH International Finance N.V., as well as serving as officer or director of a number of other Castor subsidiaries.

When the action was commenced in England in 1996, the claims were initially made against a total of 37 defendants, including defendant Mora Hotel Corporation. However, while the claims against Stolzenberg, Gambazzi, the other two individual defendants, and Castor Holdings and its subsidiaries were, from the outset, based upon a claim of a fraudulent conspiracy, the claim as against Mora Hotel was initially much more limited. Plaintiffs merely interposed a "tracing" claim, analogous to a claim for a constructive trust, in which they alleged that Mora had received funds for no consideration that could be traced to investments made by plaintiffs based upon the alleged fraud by Castor, which claims amounted to (Can.) $195,653, (Can.) $151,610 and (US) $51,662.

When plaintiffs amended their claim in 1999, following receipt of certain discovery, defendant Chascona N.V. was added as a defendant, and the claims against it as well as new claims against Mora encompassed the overall fraud as well as tracing claims. The damages then sought against them, like those against Stolzenberg and the other defendants, were over $300 million.

English Court Procedures

To commence the English proceeding, plaintiffs made two ex parte applications to the English High Court in June of 1996. One sought leave to serve various nonresident defendants, some of whom, including Mora, were sought as necessary or proper parties,[2] some as citizens of signatories to the Lugano

---

2. The decision of the motion court referred to the Lugano Convention instead of "necessary or proper party" jurisdiction as the basis of the English court's assertion of jurisdiction over these defendants; we discuss the basis upon which the English court actually asserted jurisdiction.

Convention.[3] The second application sought ex parte injunctive relief, termed a *Mareva* injunction, by which the defendants' assets would be frozen during the pendency of the proceedings and certain discovery directed.

The basis of the assertion of jurisdiction by the English High Court over Mora, and later over Chascona, namely, that they were "necessary or proper parties," is founded upon an English practice rule (*see*, Rules of Sup Ct of England [RSC], order 11, rule 1 [1] [c]). This rule permits the court to grant a plaintiff leave to serve process on out-of-jurisdiction defendants in a multidefendant case as long as one "base" or "anchor" defendant is a domiciliary of England, and the out-of-jurisdiction defendants are either necessary or proper parties. A "proper" party is one who, had he been in the country, could have been joined as a proper party to the proceeding (*see*, Dicey and Morris, Conflict of Laws, at 316 [13th ed]); a "necessary" party is "any person * * * whose presence before the Court is necessary to ensure that all matters in dispute in the cause or matter may be effectually and completely determined and adjudicated upon" (*see*, RSC, order 15, rule 6 [2]; *Barings Plc v Coopers & Lybrand*, English High Ct of Justice, Ch Div, Aug. 2, 1996, Chadwick, J. [unreported]).

In support of their two ex parte applications, plaintiffs submitted attorney affidavits and voluminous supporting documentation, which the court reviewed over a period of nine days. The court determined that plaintiffs had made the requisite showing, namely, a "good, arguable case" for the claims against the defendants.

A writ of summons was initially issued August 1, 1996, and leave of court to make Mora a defendant was granted on February 26, 1997. In March of 1997, Mora was served in New York with the writ and a *Mareva* order, restraining it from transferring assets and directing certain disclosure. Mora and its owner, Gambazzi, thereupon retained English counsel and appeared for the limited purpose of disputing the court's exercise of personal jurisdiction over them.

In an effort to protect their rights to subsequently challenge the English court's exercise of jurisdiction over them, defendants avoided raising issues that would address the merits of the substantive claims against them, and so did not challenge

3. The Lugano Convention provides for the enforcement of judgments between member states of the European Economic Community and the European Free Trade Association, the latter of which includes Austria, Finland, Iceland, Norway, Sweden and Switzerland.

the determination of the English court that they were necessary or proper parties. Rather, their jurisdictional challenge was limited to the propriety of the assertion of jurisdiction over the base defendant, Stolzenberg, on the ground that he was no longer domiciled in England at the time plaintiffs attempted to serve him with the writ of summons.

Their jurisdictional challenge to the propriety of service was denied in the English High Court. In its ruling, the court acknowledged that although there was evidence that Stolzenberg was domiciled at a London address when the writ was issued on August 1, 1996, he sold that property on August 19, 1996, prior to delivery of process to that location. Nevertheless, it concluded that jurisdiction over the moving defendants was proper. In October of 1997, defendants challenge to this order was rejected, and the order affirmed, in a 48-page opinion. Another appeal ensued, and on October 12, 2000, the House of Lords unanimously affirmed the lower courts, reasoning that jurisdiction over the anchor defendant was proper even if service could not be effectuated on the base defendant until a later date, as long as that defendant was domiciled in England on the date of issuance of the writ. It rejected the suggestion that "necessary or proper party" jurisdiction over out-of-jurisdiction defendants is only permitted if the base defendant was domiciled in England on the date of service of process.

Meanwhile, on the advice of counsel, Mora had declined to comply with the *Mareva* order, and as a result Mora was "debarred"[4] from defending on the tracing claim. Following a damages assessment hearing, plaintiff obtained judgments against Mora totaling close to $600,000.

In January 1999, plaintiffs applied to the English High Court to include Mora in the conspiracy claim previously asserted against the other defendants, and to add Chascona as a defendant on the conspiracy claim, pursuant to an amended statement of claim. Once again, the English court was required to examine the evidentiary showing submitted by plaintiffs and determine that a "good arguable case" existed regarding the claims of conspiracy against Mora and Chascona. Upon such conclusion, the court granted leave to add Chascona as a necessary or proper party and to amend the claim against Mora. The order explained that the prior debarment of Mora did not apply to the new conspiracy claim.

---

4. Black's Law Dictionary 407 (7th ed) defines debarment as "[t]he act of precluding someone from having or doing something."

Chascona interposed the same jurisdictional defense as that made by Mora, but adjourned it pending the House of Lords ruling on Mora's challenge.

In July 1999, plaintiffs applied ex parte for an order increasing the amount of the restrained assets under the *Mareva* order against Mora to $420,000,000 (Can.), and extending the same order to Chascona. On this application, too, the English High Court examined the presented evidence to determine whether plaintiffs had established the requisite "good arguable case." Following its review of the plaintiffs' showing, on July 23, 1999, the court granted this application.

Thereafter, as a result of their failure to comply with the new *Mareva* order, both Mora and Chascona were debarred from defending against the conspiracy claims. In November 1999, plaintiffs applied to the court, on notice to defendants, for an assessment of damages, and a hearing was held. In December 1999, judgments of about $330 million (US) were entered against both Mora and Chascona.

The New York Proceedings

Plaintiffs, in an effort to recover under the English judgments, undertook to seize defendants' property in New York, which is worth some $30 million. Accordingly, in May of 2000, they commenced the underlying action, asserting a cause of action for recognition and enforcement of the judgments entered in their favor in the English High Court, and seeking in addition a protective attachment. Plaintiffs thereafter requested, and were granted, a temporary fiscal monitor to review the accounts of the Gorham Hotel to ensure that there was no dissipation of assets. They then moved for an order to confirm the attachment, as well as for summary judgment recognizing and docketing as fully enforceable the English court judgments, while defendants cross-moved for dismissal.

Plaintiffs' motions were granted and defendants' request for dismissal denied.

DISCUSSION

The primary focus of defendants' argument on appeal is that the money judgments were obtained in the absence of both personal jurisdiction and due process, and therefore should not be permitted enforcement here. Specifically, defendants assert that neither Mora nor Chascona have or had any contacts with England, and therefore the English court's assertion of personal jurisdiction is incompatible with fundamental principles of our law. They also contend that Mora and Chas-

cona were denied due process of law in the English proceedings, emphasizing the ex parte aspect of the English procedures to suggest that it was not compatible with basic due process rights.

Determination of the jurisdiction issue turns on the application of CPLR article 53, New York's enactment of the Uniform Foreign Country Money-Judgments Recognition Act (*see*, CPLR 5309), which concerns the recognition and enforcement of money judgments issued by the courts of foreign countries. Under article 53, a money judgment issued by the court of a foreign country will be recognized and enforceable in New York State, unless it fits within one of the specific statutory exceptions set forth in CPLR article 53 (*see*, CPLR 5303, 5304; *Watary Servs. v Law Kin Wah*, 247 AD2d 281, 282).

The two grounds for *mandatory* nonrecognition of foreign money judgments, set forth in CPLR 5304 (a), are that the foreign judgment was

"1. * * * rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law; [or]

"2. The foreign court did not have personal jurisdiction over the defendant."

Defendants rely upon both paragraphs as grounds for denying enforcement here.

Due Process

■ There are few cases in which recognition of a foreign money judgment is denied for lack of due process under CPLR 5304 (a) (1); review of them illustrates the type of circumstances necessary to successfully establish that a judicial system failed to provide procedures compatible with due process of law. In *Bank Melli Iran v Pahlavi* (58 F3d 1406, 1411-1412, *cert denied* 516 US 989), there was evidence that Iranian trials were highly politicized, that the government did not believe in an independent judiciary, that the judiciary was biased, and that the defendant, the sister of the deposed Shah, could not possibly have gotten a fair trial in Iran. In *Bridgeway Corp. v Citibank* (45 F Supp 2d 276, 287, *affd* 201 F3d 134), there was a showing that the Liberian Constitution had been suspended, that corruption and incompetence in handling of legal cases was prevalent, and that litigants' due process rights were frequently ignored (*see also*, *Choi v Kim*, 50 F3d 244, 249-250; *Banco Minero v Ross*, 106 Tex 522, 537, 172 SW 711, 715).

In contrast, in *S.C. Chimexim S.A. v Velco Enters.* (36 F Supp 2d 206), the court concluded that the requirements of due process were satisfied by the Romanian judicial system that was newly reformed in 1992, following the country's adoption of a new Constitution in 1991 after the overthrow of the former Communist regime in 1989. Despite studies indicating that Romania's new judicial system was still not strictly following the procedures necessary to implement the basic due process guarantees contained in the new Constitution, and that it "lag[ged] badly behind many of its neighbors in clearly breaking away from the Communist past" (*id.* at 213 n 6, 214), the court concluded that the evidence regarding Romania's current judicial system sufficiently demonstrated that it is an independent system containing due process guarantees and providing impartial tribunals (*id.* at 214).

The English system of law cannot reasonably be compared with the type of system that fails to provide due process (*see, Society of Lloyd's v Ashenden*, 233 F3d 473, 476, and authorities cited therein; *Dynamic Cassette Intl. v Mike Lopez & Assoc.*, 923 F Supp 8). Recognizing this, defendants, rather than contending that the English judicial system in general fails to protect litigants' due process rights, take issue with particular aspects of this particular English proceeding, particularly the English court's use of the *Mareva* injunction.

However, since the paragraph refers to "a *system* which does not provide impartial tribunals or procedures compatible with the requirements of due process of law" (CPLR 5304 [a] [1] [emphasis supplied]), it cannot be relied upon to challenge the legal processes employed in a particular litigation on due process grounds. As the Seventh Circuit Court of Appeals explained, discussing the same provision from Illinois' enactment of the Uniform Foreign Country Money-Judgments Recognition Act,

> "The statute, with its reference to 'system,' does not support such a retail approach, which would moreover be inconsistent with providing a streamlined, expeditious method for collecting money judgments rendered by courts in other jurisdictions— which would in effect give the judgment creditor a further appeal on the merits." (*Society of Lloyd's v Ashenden*, 233 F3d 473, 477, *supra*.)

Moreover, it is important to recall that the *Mareva* order is simply a provisional remedy; it does not remove from a defendant title or the power to conduct its ordinary business. Indeed,

it bears some similarity to the grant of the provisional remedy of an order of attachment against an out-of-jurisdiction defendant (*see*, CPLR 6201 [1]).

Defendants assert that the *Mareva* injunction has been criticized by the United States Supreme Court, which quoted commentators who characterized the injunction as "the 'nuclear weapo[n] of the law'" (*see*, *Grupo Mexicano de Desarrollo v Alliance Bond Fund*, 527 US 308, 329, quoting Ough & Flenley, The Mareva Injunction and Anton Piller Order: Practice and Precedents xi [2d ed 1993]). However, while the Court in *Grupo Mexicano* declined to permit injunctive relief as broad as the English court permits with the *Mareva* injunction, it never suggested that such a practice would be violative of the due process protections of the Constitution; rather, it merely suggested that such a change in the law's protection for debtors was best left to Congress (*id.*).

Additionally, since defendants exercised their right to seek to vary or discharge the *Mareva* orders without submitting to jurisdiction, the suggestion that procedures regarding such orders were completely ex parte is inaccurate.

Furthermore, imposition of a money judgment following the taking of a default against a defendant based upon the defendant's failure to comply with discovery is an accepted procedure in this state, even where the defendant interposed (and lost) a jurisdictional challenge (*see*, *Reynolds Sec. v Underwriters Bank & Trust Co.*, 44 NY2d 568, 571-572). A defendant in a New York action who failed to comply with interim court orders may properly be subject to a judgment in the full amount sought in the complaint.

Nor have defendants established that any court proceedings took place that were prohibited by a stay. While the appellate court extended Mora's time to respond to the writ until 14 days after the House of Lords' decision on the appeal of the personal jurisdiction issue, it did not stay all proceedings. Specifically, that extension of Mora's time to respond to the writ had no effect on the issuance of the *Mareva* injunction and plaintiffs' right to take action to enforce Mora's obligation to comply with it. Indeed, Mora was debarred, and defaults taken, based not upon a failure to answer the summons, but upon the failure to comply with the *Mareva* order requiring disclosure prior to the running of Mora's time to respond. The issuance of orders punishing a party for failure to comply with injunctive relief or disclosure orders, even before defendant's time to serve its answer has run, or before it has been determined whether it is

amenable to personal jurisdiction (*see, Peterson v Spartan Indus.*, 33 NY2d 463, 465), is a procedure sometimes employed in the courts of this state as well (*see,* CPLR 6301, 6311 [1]; 3106 [a]; *Halitzer v Ginsberg*, 80 AD2d 771, 772).

Moreover, the House of Lords' decision was issued on October 12, 2000, causing Mora's time to respond to expire on October 26, 2000. Mora did nothing within that time period to respond to the summons, nor did it take any action to challenge the ruling that it was in contempt of the *Mareva* order.

In any event, defendants received the basic requisites of notice and the opportunity to be heard (*see, Society of Lloyd's v Grace*, 278 AD2d 169). Their decision not to participate in litigating the merits of the proceeding, in an effort to protect their rights to interpose a collateral challenge to enforcement of a final judgment, cannot form the basis of a claimed denial of due process (*see, Ocean Warehousing B.V. v Baron Metals & Alloys, Inc.*, 157 F Supp 2d 245, 251-252).

We perceive no valid due process complaint here based upon the procedures followed.

Personal Jurisdiction

A foreign money judgment may not be granted recognition and enforcement when "[t]he foreign court did not have personal jurisdiction over the defendant" (CPLR 5304 [a] [2]).

The determination of whether the English court lacked personal jurisdiction over Mora and Chascona involves several interrelated issues.

Initially, before considering the substantive merits of the personal jurisdiction issue, we must first address plaintiffs' contention that inasmuch as defendants actively litigated the issue of personal jurisdiction in England, the determination by the English court on that issue must be given res judicata effect, precluding its further consideration here. The threshold question is, therefore, whether defendants have the right to de novo review by this Court of the propriety of the English court's assertion of personal jurisdiction.

Res Judicata

In arguing that res judicata must be applied to the English court's determination that personal jurisdiction was proper, plaintiffs rely primarily on cases involving money judgments of sister states rather than cases involving judgments of foreign countries. As to judgments of sister states, the rule is well settled: a defendant who has made a special appearance to challenge the jurisdiction of the sister state's courts, and

whose position has been considered and rejected by that court, may not be heard to raise the jurisdictional challenge anew when the plaintiff seeks to enforce the judgment in a second state (*see, Baldwin v Iowa State Traveling Men's Assn.*, 283 US 522).

However, the same rule does not automatically apply to the judgments of foreign countries. As one Federal District Court has noted, "New York courts have consistently distinguished between judgments of sister states, which must be accorded full faith and credit as a matter of constitutional law, and judgments of foreign countries, for which full faith and credit is not constitutionally mandated" (*Nippon Emo-Trans Co., Ltd. v Emo-Trans, Inc.*, 744 F Supp 1215, 1229, citing *Schoenbrod v Siegler*, 20 NY2d 403, 409 n 3).

Indeed, the Federal District Court in *Nippon* held that "[a] defendant who appears solely for purposes of contesting jurisdiction will not, *by such appearance*, waive any jurisdictional objection in a subsequent suit to enforce the foreign judgment" (*Nippon Emo-Trans Co., Ltd. v Emo-Trans, Inc.*, 744 F Supp 1215, 1221). While acknowledging the complicated nature of this issue, that court went on to state that "As a general rule, *any* appearance in which a defendant merely challenges the jurisdiction of the foreign court should qualify under the exception found in Section 5305 (a) (2), regardless of the basis on which the foreign court upholds its jurisdiction" (*id.* at 1222).

Plaintiffs concede that had defendants defaulted completely rather than appearing before the English court for the limited purpose of challenging its jurisdiction over them, defendants would now have the right to ask this Court to examine whether a proper basis existed for the English court's assertion of jurisdiction (*see, e.g., Boorman v Deutsch*, 152 AD2d 48, 54, *lv dismissed* 76 NY2d 889; *Insurance Corp. of Ireland, Ltd. v Compagnie des Bauxites de Guinee*, 456 US 694, 706). However, other than the *Nippon* case, there is no established case law as to whether, where a defendant interposed a limited appearance in the foreign court for the sole purpose of challenging the foreign court's jurisdiction, and loses on that issue, res judicata effect must be given to the foreign court's determination that the exercise of personal jurisdiction is proper.

Review of the bare language of CPLR 5305 (a) (2) seems to support the suggestion that a New York court may, following a limited, special appearance, review the issue of whether the foreign court had personal jurisdiction over a defendant. Since the statute provides that recognition is *not* required where a

defendant appeared in the proceedings solely for the purpose of contesting the jurisdiction of the court over him, logic informs us that the propriety of the personal jurisdiction exercised by the foreign court is not absolutely established as a fact following that appearance and unsuccessful challenge.

If the contrary were true, then any time a defendant appeared in a foreign jurisdiction for the limited purpose of challenging jurisdiction, once the foreign court rejected that challenge and issued a money judgment, no further challenge here would be permissible. Since a foreign court's determination that it has personal jurisdiction does not necessarily comport with the prerequisites of this country's Constitution for such a finding, an assertion of jurisdiction by a foreign court should not preclude a challenge here. Such a challenge is not, in fact, a second bite of the apple on the jurisdiction issue.

The discussion contained in the Restatement (Third) of Foreign Relations Law provides a proposed framework for considering this point:

> "Even if the rendering court had jurisdiction under the laws of its own state, a court in the United States asked to recognize a foreign judgment should scrutinize the basis for asserting jurisdiction in the light of international concepts of jurisdiction to adjudicate. * * *

> "If the defendant appeared in the foreign court to challenge the jurisdiction of the court and failed to prevail, it is not clear whether such determination will be considered res judicata by a court in the United States asked to recognize the resulting judgment." (Vol 1, § 482, Comment c.)

The comment goes on to suggest different appropriate degrees of inquiry, depending upon the foreign court's basis for its assertion of jurisdiction. For instance, if the foreign court relied upon a finding of fact that would support an assertion of personal jurisdiction here, that court's determination should be respected, while if the foreign court depended solely upon a legal analysis, we should scrutinize the analysis to determine if the jurisdictional determination accords with our principles (see, id. at 607).

Plaintiffs point out that in the case of *Fairchild, Arabatzis & Smith, Inc. v Prometco (Produce & Metals) Co.* (470 F Supp 610, 615), the Southern District Court remarked that "by litigating and losing the issue of personal jurisdiction in

Britain, [the defendant] has no right to contest the jurisdiction of that court in a collateral action." However, in that case the defendant had entered what amounted to a voluntary general appearance. Indeed, the court took particular note that the defendant could have appeared solely for the purpose of challenging jurisdiction without entering an unconditional appearance as it did (*see*, *id*. n 5).

Upon consideration of the foregoing, we hold initially that, in this instance, res judicata effect should not be given to the English court's rejection of defendants' jurisdictional challenge, except to the extent the English court made a factual finding as to how service had been made upon Stolzenberg, and its conclusion that by such service it obtained jurisdiction over the action. Defendants were unable to raise the assertion there that they had no contacts with England, because addressing the merits of whether they were coconspirators would arguably constitute a defense on the merits of the substantive claim against them, which indeed could have led to the application of CPLR 5305 (a) (2) to prevent them from contesting jurisdiction here (*see*, *S.C. Chimexim S.A. v Velco Enters. Ltd.*, 36 F Supp 2d 206). Consequently, the merits of that court's exercise of personal jurisdiction over Mora and Chascona should be addressed here.

Necessary Proof on the Issue of Personal Jurisdiction

■ While CPLR article 53 attempts to avoid the need for extensive analysis by clearly establishing the circumstances under which our courts will and will not recognize and enforce money judgments issued by the courts of foreign countries, the circumstances of this case are not clearly covered by the provisions of that statute.

Specifically, the statute provides that a money judgment issued by a court of a foreign country will *not* be recognized if the foreign court "did not have personal jurisdiction over the defendant" (CPLR 5304 [a] [2]). However, although CPLR 5305 (a) goes on to list six specific circumstances in which a foreign money judgment "shall not be refused recognition for lack of personal jurisdiction," none of those specifics apply directly to this case. The complete section provides as follows:

"(a) Bases of jurisdiction. The foreign country judgment shall not be refused recognition for lack of personal jurisdiction if:

"1. the defendant was served personally in the foreign state;

"2. the defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or threatened with seizure in the proceedings or of contesting the jurisdiction of the court over him;

"3. the defendant prior to the commencement of the proceedings had agreed to submit to the jurisdiction of the foreign court with respect to the subject matter involved;

"4. the defendant was domiciled in the foreign state when the proceedings were instituted, or, being a body corporate had its principal place of business, was incorporated, or had otherwise acquired corporate status, in the foreign state;

"5. the defendant had a business office in the foreign state and the proceedings in the foreign court involved a cause of action arising out of business done by the defendant through that office in the foreign state; or

"6. the defendant operated a motor vehicle or airplane in the foreign state and the proceedings involved a cause of action rising out of such operation.

"(b) Other bases of jurisdiction. The courts of this state may recognize other bases of jurisdiction."

None of the six bases for jurisdiction specified in CPLR 5305 (a) apply here. Indeed, these circumstances fall within the exception contemplated by subdivision (a) (2), specifically, its exception from the jurisdictional predicate based upon a personal appearance in the foreign court, where: "2. the defendant voluntarily appeared in the [foreign] proceedings[ ] *other than* for the purpose of * * * contesting the jurisdiction of the court over him" (emphasis added).

Although application of this exception does not establish the converse, namely, that personal jurisdiction *must* be lacking where a defendant appeared only for the purpose of contesting jurisdiction, it does mean that defendants' limited appearance in the English court may not *in itself* suffice to establish personal jurisdiction under CPLR 5305 (a).

Plaintiffs therefore rely upon the catch-all provision of CPLR 5305 (b), which broadly provides that "[t]he courts of this state may recognize other bases of jurisdiction." Plaintiffs suggest

that the English law's concept of "necessary or proper party" jurisdiction should be viewed to constitute such an "other bas[i]s of jurisdiction" as is covered by CPLR 5305 (b). We are unwilling to accept so broad a proposition.[5] The question is not whether the foreign court properly exercised jurisdiction under its own laws. The use of the term "personal jurisdiction" in CPLR 5305 necessarily contemplates the definition of that term as understood in our jurisprudence.

As Professor Siegel explains in his commentary to CPLR 5305, "New York is free, under subdivision (b), to recognize in respect of the foreign judgment any other jurisdictional basis that New York law finds congenial to its notions of comity. * * * It would seem appropriate for New York to recognize for a foreign judgment, under subdivision (b) of CPLR 5305, *any jurisdictional basis it recognizes in its internal law*" (*see*, Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5305:1, at 556 [emphasis added]). That position was adopted by the Fourth Department in *Porisini v Petricca* (90 AD2d 949), where an English money judgment obtained in England against a New York domiciliary was held to be enforceable here based upon the evidentiary submissions before the English court tending to show that the defendant, along with two others, had rented and occupied an apartment in London, but had failed to pay the agreed rent. Since long-arm jurisdiction would have been proper under CPLR 302 (a) (4), a "jurisdictional basis * * * recognize[d] in [our] internal law" existed, making the English court's exercise of personal jurisdiction over the defendant proper (90 AD2d at 950, *supra* [emphasis added], citing Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 5305). Similarly, in *Canadian Imperial Bank of Commerce v Saxony Carpet Co., Inc.* (899 F Supp 1248, *affd* 104 F3d 352), the assertion of personal jurisdiction by a Canadian court in a collection action on an account receivable was held to have been proper where a New York business had ordered carpets from a Canadian manufacturer. Although the underlying negotiations and transactions took place in New York, the court held that long-arm jurisdiction would have been proper under CPLR 302 (a) (1), because a "clear nexus existed between business transacted by the defendant and the cause of action" where the

---

**5.** Notably, both parties agree that an English court may exercise "necessary or proper party" jurisdiction over someone outside England regardless of whether that party, or even that cause of action, has any connection to England.

court specified that "[t]o be subject to *in personam* jurisdiction in a foreign court, a defendant must have had certain 'minimum contacts' with the forum state" (*id.* at 1253, 1252, quoting *Ackermann v Levine,* 788 F2d 830, 838; *see also, Soloman Ltd. v Biederman & Co.,* 177 AD2d 350, 351).

Therefore, in order to recognize and enforce the money judgments issued by the English High Court against defendants, plaintiffs had to show that based upon the evidentiary materials presented to the English court, the law of this state would permit the exercise of personal jurisdiction over defendants (*see,* CPLR 302; *International Shoe Co. v State of Washington, Off. of Unemployment Compensation & Placement,* 326 US 310, 316). We turn to the submissions contained in the record to evaluate this issue.

First, however, it must be established which party has the burden of proof, and what that burden is. Plaintiffs assert that it is defendants' burden to demonstrate that the foreign court lacked jurisdiction; they rely upon *Browne v Prentice Dry Goods, Inc.* (1986 WL 6496, 1986 US Dist LEXIS 24632 [SD NY, June 5, 1986]). However, in that ruling, the District Court relied upon *Overmyer v Eliot Realty* (83 Misc 2d 694), which concerned a judgment of a sister state—which is entitled to full faith and credit—rather than that of a foreign court, which is not.

The weight of case law supports defendants' contention that in order to obtain recognition and enforcement of a foreign country's judgment, its proponent must initially make a prima facie showing of "(1) a final judgment, conclusive and enforceable where rendered; (2) subject matter jurisdiction; (3) jurisdiction over the parties or the *res*; and (4) regular proceedings conducted under a system that provides impartial tribunals and procedures compatible with due process" (*see, Ackermann v Levine,* 788 F2d 830, 842 n 12, citing *Hilton v Guyot,* 159 US 113, and Bishop and Burnette, *United States Practice Concerning the Recognition of Foreign Judgments,* 16 Intl Law 425, 429-432; *see also, Allstate Ins. Co. v Administratia Asigurarilor de Stat,* 962 F Supp 420, 425; *Bridgeway Corp. v Citibank,* 45 F Supp 2d 276, 286, *affd* 201 F3d 134; *Dresdner Bank AG v Haque,* 161 F Supp 2d 259, 262-263). We concur with the analysis of these cases.

Review of the record reflects that plaintiffs successfully made the necessary showing, that defendants' conduct, as set forth in materials submitted in the English action, provided the necessary predicate for England's exercise of personal jurisdiction

over them under our constitutional standards (*see, International Shoe Co. v Washington*, 326 US 310, 316).

"Regarding the New York standards pertaining to in personam jurisdiction, no simple test exists to determine the propriety of jurisdiction," and " '[p]roof of one transaction in New York is sufficient to confer jurisdiction [over a nonresident] as long as the activities of the defendant in question were purposeful and there is a substantial relationship between the transaction and the claim asserted' " (*Canadian Imperial Bank of Commerce v Saxony Carpet Co., Inc., supra* at 1253 [citation omitted]).

Plaintiffs rely upon the concept of coconspirator jurisdiction to provide the basis for England's exercise of personal jurisdiction. Application of this concept requires a showing that defendants were part of a conspiracy, at least part of which took place within the jurisdiction (*see, Cleft of the Rock Found. v Wilson*, 992 F Supp 574, 581-582; *Dixon v Mack*, 507 F Supp 345, 352).

To illustrate: in *Dixon v Mack* (*supra*), Mitchell Dixon, an adherent of the Unification Church, brought an action in the Southern District of New York, alleging that a conspiracy had deprived him of his civil rights by forcibly abducting him from New York City and driving him to out-of-state locations, first in New Jersey, then in Pennsylvania, where certain of the defendants attempted to "deprogram" him. Defendant William Rick was a Pennsylvania psychiatrist hired by one of the other defendants, after the abduction, to examine Dixon, following which Rick wrote a report asserting that in his professional opinion, Dixon was "unbalanced" (*id.* at 347). Rick, in moving to dismiss the complaint against him for lack of personal jurisdiction, asserted that his practice was in Pennsylvania and he had no connection to New York, and indeed, that his only act was to examine Dixon, in Pennsylvania, after Dixon's abduction (*id.*). However, the court noted that the allegations of the complaint and some evidentiary materials gave rise to reasonable inferences not only that Rick knew he was participating in an effort to "deprogram" Dixon, but that in the process of joining the conspiracy he subsequently ratified Dixon's abduction (*id.* at 348-349). Consequently, his alleged participation in the conspiracy, including his ratification of an act that took place in New York, was sufficient for a prima facie showing that New York could properly exercise jurisdiction over Rick, although the denial of his motion was without prejudice to renewal at trial (*id.*).

The affidavits and supporting materials provided to the English court were sufficient to have demonstrated, prima facie, that Mora and Chascona, through their owner, Marco Gambazzi, were active participants in the conspiracy alleged in the present case, which conspiracy included acts which took place in England.

Specifically, plaintiffs submitted affidavits explaining that to accomplish the complained-of fraud, the four individual defendants named in the English action, Wolfgang Stolzenberg, Marco Gambazzi, Edwin Bänziger, and Karsten Bodo Von Wersebe, misrepresented Castor Holdings to investors as a bona fide investment company in a healthy financial position, while knowingly manipulating Castor's business and financial accounts so as to avoid disclosing the true facts. These four individuals, it was explained, used their positions in both Castor subsidiaries and in the companies to which Castor made loans, so as to disguise the actual flow of funds between Castor Holdings and related borrowers, lenders and developers. While Castor's accounts made it appear to investors as an active, growing business consisting of performing loans, new loans and reasonable returns, these individuals disguised the true nature and value of the projects to which loans were made, the purpose for which the funds would be used, and the extent of returns Castor received on the loans.

Plaintiffs' showing tends to support not only the proposition that Gambazzi individually played a significant role in the alleged conspiracy, but also that Gambazzi acted on behalf of Mora and Chascona as well.

There was evidence that both Mora and Chascona were controlled, as well as owned in whole or in part, by individual defendant Marco Gambazzi. In official filings in New York State, Gambazzi described himself as Mora's Chief Executive Officer. He was at least a part owner of Chascona, and regularly acted on its behalf during the pertinent time period. There was also evidence that on defendants' behalf, Gambazzi retained Wolfgang Stolzenberg, the asserted ringleader of the Castor Holdings fraud scheme, as a management consultant for Mora, Chascona, and the Gorham Hotel, in 1989.

Mora and Chascona, the documents explain, were among the companies that received loans from and gave mortgages to various Castor-related entities. While the financial arrangements set out in plaintiffs' submissions are too elaborate to discuss in this context, the loans Stolzenberg and/or Gambazzi arranged for Mora and Chascona to receive from Castor fall

within the pattern of Castor's typical scheme. For example, on one Castor loan, an arrangement was made for partial refinancing on terms that left Castor unsecured as to a balance of over $2 million. Additionally, interest on loans made to Mora and Chascona was capitalized without the capitalization of interest revealed in Castor's financial statements. By the time of Castor's collapse, a total of approximately $21.35 million was owed by Mora and Chascona on loans from Castor.

Sufficient information was submitted to the English High Court to make a prima facie showing that Gambazzi and/or Stolzenberg, acting on behalf of Mora and Chascona as well as individually, knowingly caused the Castor Group to make loans to Mora and Chascona under the foregoing terms as part of a fraudulent scheme, using funds procured from investors through the use of misrepresentations.

Furthermore, the asserted conspiracy, as it was set forth in the documents plaintiffs submitted to the English High Court, had sufficient connection to England to permit a proper exercise of jurisdiction over any knowing coconspirator, and Mora and Chascona, due to the knowledge they possessed through Gambazzi, were properly included as such.

Inasmuch as plaintiffs made a prima facie showing that defendant corporations, through Marco Gambazzi, were active participants in the conspiracy asserted in the English action, it must be concluded that the English court's exercise of personal jurisdiction over Mora and Chascona was presumptively proper, unless evidence presented by defendants successfully demonstrated that plaintiffs' prima facie showing was false.

It has all along been defendants' position that (1) the Castor Holdings fraud was perpetrated solely by Stolzenberg, and Gambazzi was merely an outside director who also invested his own and his corporations' money and was therefore as much an innocent victim as Castor's other investors; (2) Mora and Chascona were unconnected with the fraud, having merely received (and largely repaid) a loan from a Castor subsidiary; (3) the fraud took place solely in Canada and the United States. However, their affidavits in support do not succeed in demonstrating that the English court lacked a basis to exercise personal jurisdiction over them (*see, Porisini v Petricca, supra*). Accordingly, their challenge to the judgments under CPLR 5304 (a) must fail.

Other Grounds for Nonrecognition of Foreign Judgments

Defendants raise, for the first time on appeal, several other grounds for declining to enforce the English judgments, derived

from subdivision (b) of CPLR 5304, which identifies seven additional grounds upon which to deny recognition of judgments issued by the courts of foreign countries. Defendants contend (1) that the English judgments are "repugnant to the public policy of this state" (CPLR 5304 [b] [4]) because the *Mareva* order is incompatible with the American approach to the judiciary's equitable powers; (2) that "the judgment conflicts with another final and conclusive judgment" (CPLR 5304 [b] [5]), since the public prosecutor of the Canton of Ticino, Switzerland, after conducting an investigation of a complaint by one of the plaintiffs against Gambazzi and other individuals, decided not to prosecute; (3) that the amounts of the judgments are unconscionable; and (4) that England was a seriously inconvenient forum (CPLR 5304 [b] [7]). It is undisputed that defendants bear the burden of proving these discretionary grounds for nonrecognition.

Defendants' failure to raise these contentions before the motion court constitutes a waiver of them. Moreover, were we to address these contentions on their merits, we would reject them. The exercise of discretion by a Swiss prosecutor in dismissing a charge brought against Marco Gambazzi simply does not constitute the sort of "final and conclusive" judgment contemplated by CPLR 5304 (b) (5). Defendants' assertion of inconvenient forum is inapplicable, since CPLR 5304 (b) (7) applies to circumstances where "jurisdiction [is] based only on personal service, [and] the foreign court was a seriously inconvenient forum for the trial of the action," because here the English court's jurisdiction over defendants was not based solely upon personal service. Finally, we do not find plaintiffs' recovery of losses from defendants arising out of the asserted fraudulent conspiracy to be in any way repugnant to the public policy of New York.

The motion court's appointment of a temporary fiscal monitor in the context of the interim application was proper, inasmuch as the monitor's duties were limited to review of the hotel's accounts to ensure its assets were not dissipated or mishandled, and no affirmative control was taken over defendant's assets prior to final judgment.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Ira Gammerman, J.), entered January 16, 2001, which, inter alia, granted plaintiffs' motion for summary judgment recognizing and docketing certain judgments entered in their favor in the High Court of Justice, Chancery Division, London, England, should be affirmed, with costs.

NARDELLI, J.P., ROSENBERGER, ELLERIN and LERNER, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered January 16, 2001, affirmed, with costs.