*218
 
 OPINION OF THE COURT
 

 Read, J.
 

 Defendants here appeal from an order of the Appellate Division, which, among other things, affirmed Supreme Court’s order and judgment recognizing and docketing certain judgments entered against them by the English High Court of Justice, Chancery Division, pursuant to New York’s version of the Uniform Foreign Country Money-Judgments Recognition Act (CPLR art 53). For the reasons that follow, we conclude that the English judgments at issue satisfy the statutory prerequisites for recognition.
 

 I.
 

 In 1992, Castor Holdings Ltd., a Canadian real estate and financial investment company, declared bankruptcy. Plaintiffs CIBC Mellon Trust Company, as trustee of several pension and other benefit funds, and DaimlerChrysler Canada, Inc. had lost millions of dollars in investments in Castor. In May 1996, plaintiffs commenced legal proceedings in England in the High Court, alleging that they had been duped into making these investments by what amounted to a massive, multinational fraud. The suit named Wolfgang Otto Stolzenberg, the president, CEO and chairman of Castor, as the primary defendant accused of masterminding the fraud.
 

 Marco Gambazzi, a Swiss attorney, was also individually named as a defendant. Gambazzi owned, in whole or in part, and controlled Mora Hotel Corporation N.V. and Chascona N.V.,*
 
 [1]
 
 which were among the numerous corporations eventually named as defendants in the English proceedings. Plaintiffs initially asserted only a “tracing” claim against Mora for receipt of funds for no consideration, which were traceable to the alleged fraud. When plaintiffs added a claim of conspiracy against Mora in January 1999, they joined Chascona as a coconspirator.
 

 Mora is the ground lessee and operator of the Gorham Hotel, located in midtown Manhattan, and Chascona is the fee owner
 
 *219
 
 of the property. They are both Netherlands Antilles corporations authorized to do business in New York. The Gorham Hotel is apparently their sole asset.
 

 Plaintiffs made two kinds of ex parte applications to the High Court. The first sought leave to serve various nonresident defendants, including Mora (and later, Chascona), as “necessary or proper” parties. This rule (see UK Civ Pro Rules [1998] SI 1998/3132, part 6 [III], rules 6.20, 6.21) allows out-of-the-jurisdiction service on such a party when the liability of the defendants, either jointly or individually, depends upon a single investigation (see
 
 Massey v Heynes & Co.,
 
 21 QBD 330 [Ct App 1888]). In order for the High Court to exercise such “necessary or proper” jurisdiction, however, at least one defendant — in this instance, Stolzenberg — must be an English domiciliary and serve as the base or anchor defendant (see rules 6.20, 6.21). The second kind of ex parte application sought
 
 Mareva
 
 injunctions or orders (see
 
 Mareva Cia. Naviera S.A. v International Bulkcarriers S.A.,
 
 2 Lloyd’s Rep 509 [1975]) to freeze defendants’ assets on a world-wide basis during the pendency of the English proceedings and to direct certain discovery. The initial
 
 Mareva
 
 order required Mora to provide information and documents relating to the tracing claim and its assets as well as copies of any documents relevant to the proceedings. In support of this application, plaintiffs submitted attorney affidavits and voluminous supporting documentation. After reviewing these materials over nine days, the High Court determined that plaintiffs had made the requisite showing; namely, a “good arguable case.”
 

 In March 1997, plaintiffs served Mora in New York with a writ of summons and the
 
 Mareva
 
 order. Mora appeared in the English proceedings for the limited purpose of contesting the High Court’s jurisdiction over Stolzenberg, the anchor defendant, on the grounds that he was not domiciled in England at the time that Mora argued was critical (i.e., when the writ of summons for Stolzenberg was served rather than when it was issued). In May 1997, the High Court rejected Mora’s argument and dismissed its application to set aside service of the writ on it; and the Court of Appeal dismissed Mora’s appeal in October 1997. Finally, in October 2000, the House of Lords dismissed Mora’s appeal from the Court of Appeal. Chascona abandoned its identical jurisdictional challenge following the House of Lords’ dismissal of Mora’s appeal.
 

 While disputing the High Court’s jurisdiction, Mora elected not to comply with the
 
 Mareva
 
 order relating to the tracing
 
 *220
 
 claim and several subsequent orders to secure compliance with it. Some of these orders were “unless” orders, which explicitly warned Mora that continued recalcitrance would lead to its debarment or preclusion from defending against the tracing claim and permit plaintiffs to obtain judgment. When Mora failed to take heed, a default judgment was entered against it for roughly $600,000 (U.S.) in February 1999, following a damages assessment hearing.
 

 In July 1999, plaintiffs applied ex parte to increase to $420 million (Can.) the value of Mora’s assets covered by the
 
 Mareva
 
 order, and to grant the same freezing relief with respect to Chascona on account of the conspiracy claims pending against them both. Once again, before granting plaintiffs’ applications, the High Court examined the evidence to determine whether plaintiffs had established the requisite “good arguable case.”
 

 Thereafter, as a result of their failure to comply with the new
 
 Mareva
 
 and concomitant “unless” orders, both Mora and Chascona were debarred from defending against the main fraudulent conspiracy claims. Plaintiffs applied to the High Court for an assessment of damages, and a hearing was held. In December 1999, default judgments of roughly $330 million (U.S.) were entered in England against both Mora and Chascona on the conspiracy claims.
 

 In May 2000, plaintiffs commenced an action in Supreme Court, seeking recognition of the English judgments pursuant to the Uniform Foreign Country Money-Judgments Recognition Act (CPLR art 53) and New York common law, as well as an attachment of the Gorham Hotel, reportedly worth approximately $30 million. On January 16, 2001, Supreme Court granted plaintiffs summary judgment recognizing and docketing the English judgments; confirmed the attachment; appointed a postjudgment receiver to manage and sell the Gorham Hotel in satisfaction of the English judgments; and denied defendants’ cross motion to dismiss the complaint.
 

 The Appellate Division affirmed Supreme Court’s order and judgment on May 28, 2002 (296 AD2d 81 [2002]). This appeal pursuant to CPLR 5601 (b) (1) followed. The constitutional issues asserted as a basis for our jurisdiction on the appeal are, broadly stated, whether the courts below violated defendants’ due process rights by (1) determining that the English courts properly exercised personal jurisdiction over them; and (2) recognizing foreign judgments that were entered on default following defendants’ failure to comply with a provisional remedy (the
 
 Mareva
 
 orders) not available in New York.
 

 
 *221
 
 Subsequent to Supreme Court’s decision and order, defendants in 2001 and 2002 applied to the High Court to set aside the default judgments entered against them because of their failure to comply with the “unless” orders, and to allow them to defend the tracing and conspiracy claims on the merits. After a six-day hearing, which took place from December 9-16, 2002, the High Court dismissed defendants’ applications on February 3, 2003. Plaintiffs then moved to dismiss this appeal, arguing that defendants’ applications to the High Court mooted the asserted constitutional bases. We withheld decision and entertained oral argument on both the motion and the appeal.
 

 II.
 

 New York has traditionally been a generous forum in which to enforce judgments for money damages rendered by foreign courts
 
 (see e.g. Lazier v Westcott,
 
 26 NY 146 [1862];
 
 Dunstan v Higgins,
 
 138 NY 70 [1893];
 
 Cowans v Ticonderoga Pulp & Paper Co.,
 
 246 NY 603 [1927];
 
 see also Greschler v Greschler,
 
 51 NY2d 368, 376 [1980]; Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C5301:l, at 540); and in 1970, New York adopted the Uniform Foreign Money-Judgments Recognition Act
 
 (see
 
 Uniform Foreign Money-Judgments Recognition Act §§ 1-9, 13 ULA [part II] 43-80; L 1970, ch 981, §§ 1-2)
 
 [2]
 
 as CPLR article 53. Article 53 was designed to codify and clarify existing case law on the subject and, more importantly, to promote the efficient enforcement of New York judgments abroad by assuring foreign jurisdictions that their judgments would receive streamlined enforcement here
 
 (see
 
 Judicial Conference Mem in Support, Bill Jacket, L 1970, ch 981, at 4; Kulzer,
 
 The Uniform Foreign Money-Judgments Recognition Act,
 
 reprinted in 13th Ann Report of NY Jud Conf 194, 195-196, 226 [1968]).
 
 [3]
 

 Article 53 applies to “any foreign country judgment which is final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal” (CPLR 5302). Simply put, a foreign country judgment is considered “conclusive between the parties to the extent that it grants or denies recovery of a sum of money’ (CPLR 5303) unless
 

 “1. the judgment was rendered under a system
 
 *222
 
 which does not provide impartial tribunals or procedures compatible with the requirements of due process of law; [or]
 

 “2. the foreign court did not have personal jurisdiction over the defendant” (CPLR 5304 [a] [1], [2]).
 

 Moreover, “[i]n proceeding under article 53, the judgment creditor does not seek any new relief against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the foreign country money judgment and converting it into a New York judgment”
 
 (Lenchyshyn v Pelko Elec.,
 
 281 AD2d 42, 49 [4th Dept 2001]).
 

 On this appeal, defendants direct their principal fire related to CPLR 5304 (a) (1) at the High Court’s use of
 
 Mareva
 
 orders. While we have expressed concern regarding the power and potential commercial disruption of
 
 Mareva
 
 orders
 
 (see Credit Agricole Indosuez v Rossiyskiy Kredit Bank,
 
 94 NY2d 541, 550-551 [2000]), the use of this device, standing alone, does not render the English
 
 system
 
 as a whole incompatible with our notions of due process
 
 (see e.g. Guinness PLC v Ward,
 
 955 F2d 875, 900 [4th Cir 1992]). In short, CPLR 5304 (a) (1) does not demand that the foreign tribunal’s procedures exactly match those of New York. Rather, the statute is satisfied if the foreign court’s procedures are “compatible with the requirements of due process of law”
 
 (id.
 
 at 882). Moreover, “[considering that our own jurisprudence is based on England’s, a defendant sued on an English judgment will rarely be in a position to defeat it with such a showing” (Siegel, 2001 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C5304:l, 2003 Pocket Part, at 65;
 
 see also Society of Lloyd’s v Ashenden,
 
 233 F3d 473, 476 [7th Cir 2000] [“Any suggestion that (England’s) system of courts ‘does not provide impartial tribunals or procedures compatible with the requirements of due process of law’ borders on the risible”]).
 

 In summary, the relevant inquiry under CPLR 5304 (a) (1) is the overall fairness of England’s legal “system,” which is beyond dispute
 
 (see Society of Lloyd’s v Grace,
 
 278 AD2d 169 [1st Dept 2000];
 
 Society of Lloyd’s v Ashenden, supra; compare Bridgeway Corp. v Citibank,
 
 201 F3d 134 [2d Cir 2000] [fairness of Liberian courts]). Indeed, defendants were given ample notice and numerous opportunities to present their defense in England; they simply elected to forego these opportunities (apparently against the advice of their English attorneys) for strategic reasons.
 

 
 *223
 
 Turning next to CPLR 5304 (a) (2), the question is whether the English courts had jurisdiction over defendants. Before reaching this question, however, we must consider the merits of plaintiffs’ motion to dismiss. Plaintiffs argue that when defendants applied to the High Court, seeking relief from the English judgments and the opportunity to defend on the merits, they “voluntarily appeared in the proceedings” within the meaning of CPLR 5305 (a) (2), thus mooting this appeal. While such a voluntary appearance would not, in our view, moot the appeal, it would abrogate the reviewability of defendants’ argument that the English judgments are unenforceable in New York because the English courts lacked jurisdiction over them.
 

 Section 5305 (a) (2) provides in relevant part that a foreign judgment shall not be denied recognition for lack of personal jurisdiction if “the defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or threatened with seizure * * * or of contesting the jurisdiction of the court over him” (CPLR 5305 [a] [2]). Plaintiffs contend that defendants’ application to the High Court does not fall within either exception, particularly the second; i.e., it was not an appearance “for the purpose * * * of contesting * * * jurisdiction * * * over [them].”
 

 The commentary for CPLR 5305 (a) (2) explains that this second exception is restricted to an
 

 “appearance * * * solely to protest jurisdiction, what New York used to call and some places still call a ‘special appearance’.
 
 If the judgment debtor did any more than she had to do, however, to preserve her jurisdictional objection in the foreign court, she would thereby have submitted voluntarily to its jurisdiction and forfeited the right to claim an exception for herself under this paragraph”
 
 (Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C5305:l, at 556 [emphasis supplied]).
 

 Federal courts applying New York law have, in fact, interpreted CPLR 5305 (a) (2) to foreclose a defendant from contesting a foreign judgment for lack of personal jurisdiction once the defendant has done anything more than it had to do to preserve its jurisdictional objection (see
 
 S.C. Chimexim S.A. v Velco Enters. Ltd.,
 
 36 F Supp 2d 206, 215 [SD NY 1999];
 
 Nippon Emo-Trans Co., Ltd. v Emo-Trans, Inc.,
 
 744 F Supp 1215, 1222-1226 [ED NY 1990]).
 

 
 *224
 
 In
 
 S.C. Chimexim S.A.,
 
 a Romanian plaintiff sued an American corporate defendant with its principal place of business in New York for an alleged breach of contract in Romania. The defendant failed to appear and the Romanian tribunal, thereafter, entered judgment for approximately $200,000. The defendant appealed from the Romanian judgment, raising multiple grounds going to both the merits and personal jurisdiction. In the federal action to enforce the Romanian judgment, the court held that the defendant had made a voluntary appearance pursuant to CPLR 5305 (a) (2) and was, thus, precluded from contesting personal jurisdiction
 
 (S.C. Chimexim S.A.
 
 at 215).
 

 In
 
 Nippon Emo-Trans Co., Ltd.,
 
 a Japanese judgment creditor sought an order confirming attachment of a New York company’s assets in order to satisfy the judgment it had obtained against the company in Japan. The court determined that the New York company’s appearance in the Japanese action to defend on the merits after losing its jurisdictional challenge was a voluntary appearance within the meaning of CPLR 5305 (a) (2)
 
 (Nippon Emo-Trans Co., Ltd.
 
 at 1222-1226).
 

 The
 
 Nippon
 
 court reasoned that the traditional conceptual differences between “general” and “special” appearances prevailing at the time CPLR article 53 was adopted formed the “conceptual underpinnings” of section 5305 (a) (2)
 
 (id.
 
 at 1225). The court also relied upon a section of the Restatement of the Conflict of Laws, which states that “[a] general appearance is one where the defendant either enters an appearance in an action without limiting the purpose for which he appears or where he asks for relief which the court may give only if it has jurisdiction over him”
 
 (id.
 
 at 1224, quoting Restatement [Second] of Conflict of Laws § 33, Comment
 
 d).
 
 Included in this category are those instances where a defendant “makes a motion raising a question as to the merits of the plaintiff’s claim even though the defendant shows that he does not intend thereby to submit himself to the jurisdiction of the court”
 
 (id.).
 

 While New York no longer distinguishes between a general and special appearance
 
 (see
 
 CPLR 320), we agree with the
 
 Nippon
 
 court that the language and structure of CPLR 5305 (a) (2) have retained the traditional distinction for purposes of recognition actions. Accordingly, the pertinent question-here is whether defendants’ applications to the High Court amounted to a voluntary appearance within the meaning of CPLR 5305 (a) (2).
 

 
 *225
 
 The “skeletal argument” submitted by defendants on their applications to set aside the English judgments and the High Court’s decision leave no room for doubt that defendants were arguing the merits of the conspiracy claims in the English proceedings. They made arguments and presented proof in an attempt to persuade the High Court that their reasons for disobeying the
 
 Mareva
 
 and “unless” orders were reasonable. Significantly, “[c]onsiderable time was spent, on the hearing of the Applications, on the issue of the legal merits of the claims against Mora and Chascona”
 
 (CIBC Mellon Trust Co. v Stolzenberg,
 
 [2003] EWHC 13 [Ch], 2003 WL 117093, at 46 [High Ct Justice, Ch Div, Feb. 3, 2003]). Exploration of the legal merits of the conspiracy claims in particular “took up much of the hearing”
 
 (id.
 
 at 66).
 
 [4]
 
 Defendants did not preserve any objection to the High Court’s jurisdiction over them for purposes of this recognition proceeding. Indeed, they went so far at oral argument as to suggest that if they had successfully vacated the English judgments and unsuccessfully defended on the merits, they still could have contested personal jurisdiction in a future New York recognition proceeding.
 

 We disagree. When defendants applied to the High Court to set aside the English judgments and to defend on the merits, they did more than they had to do to preserve a jurisdictional objection — which was, in any event, foreclosed to them in England by the House of Lords’ decision — and so they voluntarily appeared in the foreign proceeding within the meaning of CPLR 5305 (a)(2).
 

 We note that CPLR 5305 (a) (2) does not on its face distinguish between voluntary appearances taking place in the foreign proceeding before or after judgment; and the two federal cases discussed above each involved postjudgment appearances by the judgment-debtors. The Restatement of the Conflict of Laws likewise makes no pre- or postjudgment distinction, stating that a defendant may be deemed to have made an appearance in an action and, therefore, to have submitted to a court’s jurisdiction, by, among other things, “taking steps in the action
 
 *226
 

 after judgment either in the trial court or in an appellate
 
 court” (Restatement [Second] of Conflict of Laws § 33, Comment
 
 b
 
 [emphasis supplied];
 
 see
 
 Restatement [Third] of Foreign Relations Law of United States § 421 [3] [stating that “(a) defense of lack of jurisdiction is generally waived by any appearance * * * if the appearance is for a purpose that does not include a challenge to the exercise of jurisdiction”]).
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Smith, Ciparick, "Wesley, Rosenblatt and Graffeo concur; Chief Judge Kaye taking no part.
 

 Order affirmed, with costs.
 

 [1]
 

 . Gambazzi had also served as a director of Castor, a managing director of Castor’s principal lending subsidiaries and an officer or director of a number of other Castor subsidiaries.
 

 [2]
 

 . Twenty-nine other states and the District of Columbia have adopted variations of the Uniform Act.
 

 [3]
 

 .
 
 See also
 
 Kulzer,
 
 Recognition of Foreign Country Judgments in New York: The Uniform Foreign Money-Judgments Recognition Act,
 
 18 Buf L Rev 1 (1969).
 

 [4]
 

 . The High Court Judge, The Honourable Mr. Justice Etherton, remarked on both the volume of materials submitted and the length of the proceedings: “There were more than sixty lever-arch files [binders] placed before me, for the purposes of the Applications. The hearing before me lasted six days, and undoubtedly would have lasted considerably longer” had defendants’ counsel not had another engagement and if the court had allowed plaintiffs to continue in proving the merits of their conspiracy claims
 
 (CIBC Mellon Trust Co. v Stolzenberg, supra
 
 at 79).